EL PUEBLO DE PUERTO RICO, demandante y apelado, *v.* WILLIAM DÍAZ JUST, acusado y apelante.

*Número:* CR-67-278        *Resuelto:* 14 de marzo de 1969

*Godofredo M. Gaetán,* abogado del apelante; *Rafael A. Rivera Cruz, Procurador General,* y *Lydia M. Franquiz, Procuradora General Auxiliar,* abogados de El Pueblo.

EL JUEZ ASOCIADO SEÑOR DÁVILA emitió la opinión del Tribunal.

El apelante fue acusado y convicto por infracción a la Sec. 5-801 inciso (a) de la Ley Núm. 141 de 20 de julio de 1960 (9 L.P.R.A. sec. 1041). El día 4 de julio de 1964, a eso de las nueve de la noche, impactó con su automóvil la parte trasera de un vehículo conducido por el policía Gerardo Batista. Acto seguido el oficial se dirigió al vehículo del acusado. Encontró a éste recostado sobre el volante del vehículo

que iba manejando. Le preguntó repetidas veces si le había sucedido algo y éste no contestó. Le invitó a desmontarse. Se desmontó. Afirma que el acusado expedía un fuerte olor a licor. Le pidió que caminara y como lo hacía con dificultad y tambaleándose, decidió llamar a otro agente para que investigara. Le pidió que le mostrara la licencia de conducir y así lo hizo. La prueba no estableció que tuviera dificultad en encontrar la licencia. Declaró en repregunta que el acusado en todo momento se portó como un caballero. El otro agente declaró que al llegar al sitio del accidente notó que el acusado expedía un fuerte olor a licor y que caminaba en forma vacilante. Declaró además que hablaba incoherentemente. Le pidió que se sometiera a una prueba de sangre u orina. Accedió. Este testigo en repregunta afirmó que el comportamiento del apelante fue en todo momento respetuoso. Manifestó que hablar incoherentemente para él significaba que no se entendía bien lo que hablaba. El médico que tomó la muestra de sangre declaró que la muestra tomada al acusado fue la primera que tomaba en el dispensario. Afirmó que la enfermera usó alcohol como desinfectante y que cuando le tomó la muestra el brazo estaba todavía mojado. En repregunta manifestó que el comportamiento del apelante fue normal "cuantas preguntas le hice las contestó, cooperaba bien, la compostura era correcta." Preguntado si daba alguna demostración de estar en estado de embriaguez, contestó "Clínicamente a mí no me dio la impresión, como él actuaba no era de una persona que estaba en estado de embriaguez. . . ." Según la perito química Gloria Circums, el resultado del análisis de alcohol en la sangre fue de .23 centésimas de uno por ciento de alcohol por peso de sangre.

Apunta el apelante dos errores: (1) admitir en evidencia el análisis químico de la sangre y (2) declarar culpable al acusado a base de una prueba contradictoria e insuficiente.

Sostiene que el resultado del análisis de la sangre quedó

viciado y afectado por el alcohol utilizado como antiséptico en el brazo donde se tomó la muestra.

■ Se ha sostenido que una muestra de sangre tomada en estas circunstancias desacredita y resta valor al análisis, haciéndola inadmisible en evidencia. *People* v. *Malone,* 197 N.E.2d 189 (N.Y. 1964) ; *People* v. *Ward,* 178 N.Y.S.2d 708 (N.Y. 1958) ; *People* v. *Douglas,* 183 N.Y.S.2d 945 (1959) ; *People* v. *Maxwell,* 188 N.Y.S.2d 692 (1959) ; *City of Columbus* v. *Marks,* 194 N.E.2d 791 (Ohio 1963) ; Richardson, *Modern Scientific Evidence,* Sec. 13.11 (1961) ; Erwin, *Defense of Drunk Driving Cases,* Sec. 14.06 (1963) ; Levin, *Blood Alcohol Tests and Drunken Drivers,* 1964, Insurance L.J. 453, 456 (1964) ; Rabinowitch, *Medicolegal Aspects of Chemical Tests of Alcoholic Intoxication,* 39 J. Crim. & Crim. Law 225, 229 (1948). Es posible que la muestra se adultere y que el alcohol usado como antiséptico afecte el resultado del análisis. En el presente caso la prueba estableció que al tomar la muestra, el brazo todavía estaba mojado con alcohol. Esto afectó la base científica del análisis y necesariamente surge una duda razonable en cuanto a su valor como prueba de intoxicación. Especialmente cuando la ley dispone que determinado resultado establece una presunción al efecto de que el conductor está bajo los efectos de bebidas embriagantes, 9 L.P.R.A. sec. 1041. El Reglamento aprobado por el Secretario de Salud nada dispuso sobre esta cuestión. Sólo estableció que "se tomará por vaso punción con aguja y jeringuilla esterilizadas y secas . . . ." 9 R.&R.P.R. sec. 1043–1(a). Al tomar las muestras de sangre debe tenerse especial cuidado en hacerlo de acuerdo con las normas y prácticas generalmente aceptadas para no afectar la confiabilidad del análisis. La Asamblea Legislativa tuvo gran preocupación en cuanto a la toma de las muestras de sangre. Específicamente dispuso en el inciso (g) de la Sec. 5–803 de la Ley de Automóviles que "solamente un médico, una enfermera graduada

o cirujano menor . . . podrá extraer una muestra de sangre para determinar su contenido alcohólico."

En un artículo titulado, *"Chemical Test for Intoxication Prosecution Viewpoint"*, que aparece publicado, I Trauma 3-19-28 (ed. 1959) se explica el procedimiento para obtener una muestra de sangre con el propósito de determinar si un conductor está bajo los efectos de bebidas embriagantes. Expone el autor: "No debe utilizarse alcohol para esterilizar la piel al momento de tomar la muestra ya que esto posiblemente puede traer una lectura alta falsa. El Consejo de Seguridad Nacional recomienda que se use en su lugar tintura de iodo, tintura de metafen, jabón verde, roccol, septisol o santo-merse."

Precisa apuntar que en el Estado de Virginia, la ley expresamente dispone que no se usará alcohol como desinfectante al obtener la muestra. (1) En un artículo titulado *"Virginia's Implied Consent Statute: A Survey and Appraisal"*, 49 Va. L. Rev. 386, 399 (1963) se dice:

"Una breve observación es necesaria para encomiar la previsión legislativa al prohibir el uso del alcohol como esterilizador durante la administración del examen de la sangre. Anteriormente ya se había establecido que tal procedimiento podía invalidar el resultado del análisis."

Ver además *Kyhl* v. *Commonwealth*, 135 S.E.2d 768 (Va. 1964).

Es por eso necesario que las muestras se tomen observando todas las precauciones para impedir que pueda surgir alguna

---

(1) Dispone así el estatuto de Virginia:

"La muestra de sangre que se toma con el propósito de determinar el contenido de alcohol únicamente podrá ser tomada por un médico, una enfermera profesional registrada, o un técnico de laboratorio graduado, usando algún tipo de esterilizador o antiséptico, para los instrumentos a usarse y para aquella parte del cuerpo de la cual la sangre se toma que no sea alcohol u otra substancia que pueda afectar la confiabilidad del análisis." 49 Va. L. Rev. págs. 388–389.

duda en cuanto al resultado del análisis. (²) Sabemos que los accidentes de tránsito representan un problema de agudas dimensiones. Y que el conductor borracho es una seria amenaza. Pero sobre todo esto está la responsabilidad del juzgador en su misión de impartir justicia de acuerdo con la ley. Si surge duda fundada en cuanto a la confiabilidad del análisis es deber del juzgador rechazarlo. (³)

A veces, la duda que pueda surgir en cuanto a la veracidad o confiabilidad del análisis queda superada, cuando la prueba objetiva demuestra que el conductor estaba bajo los efectos de bebidas embriagantes. Ya hemos decidido que se puede establecer que un conductor estaba bajo los efectos del alcohol por medio del testimonio de las personas que observaron su comportamiento. *Pueblo* v. *Cabrera Osorio*, 84 D.P.R. 97 (1961) (Per Curiam); *Pueblo* v. *Tribunal Superior*, 84 D.P.R. 392 (1962); *Pueblo* v. *Cruz Rivera*, 88 D.P.R. 332 (1963). Pero eso no ocurrió en el presente caso. Aquí la prueba presentada por el Estado no establece más allá de duda razonable que el apelante estuviera bajo los efectos del alcohol. Los policías declararon que olía a licor; que al andar se tambaleaba y que hablaba incoherentemente. Pero asimismo declaran que al ordenársele que descendiera del vehículo inmediatamente lo hizo, que mostró la licencia de conductor al serle pedida sin que se estableciera que tuvo .dificultad en encontrarla, y que contestó todas las preguntas. No hay prueba de que tuviera las pupilas dilatadas ni los

---

(²) Debe considerarse la conveniencia de enmendar el Reglamento al efecto de consignar que al tomar la muestra no se usará antiséptico alguno conteniendo alcohol que pueda afectar el resultado del análisis.

(³) Algunas autoridades sostienen que el resultado del análisis es admisible pero lo que queda afectado es su valor probatorio. *Crews* v. *Commonwealth*, 138 S.E.2d 265 (1964); *State* v. *Schwade*, 131 N.W.2d 421 (1964); *State* v. *Erdman*, 391 P.2d 518 (1964). Entendemos que la mejor práctica es no admitirlo y que las muestras se tomen siguiendo las normas generalmente establecidas para salvaguardar el resultado correcto del análisis, que como hemos visto, incluye el que no se use alcohol como desinfectante.

ojos rojizos. Por otro lado el médico que le tomó la muestra manifestó que el comportamiento fue normal, que cuantas preguntas le hizo las contestó, que cooperaba bien y que clínicamente no le dio la impresión de que estuviera en estado de embriaguez. El que al andar se tambaleara y que hablara incoherentemente(*) no es incompatible con lo declarado por el médico que tomó la muestra de sangre. Puede explicarse en que los agentes lo observaron seguida de ocurrido el accidente. Obsérvese que no establecieron que tuviera los ojos rojizos ni las pupilas dilatadas. Esto y el que pudiera coordinar para contestar todas las preguntas, y el haber localizado inmediatamente su licencia concuerda con las observaciones del médico. Evidentemente el juez sentenciador fue impresionado por el resultado del análisis de sangre.

Claramente esta prueba, sin el apoyo del resultado del análisis, no establece la culpabilidad del acusado más allá de duda razonable. *Procede la revocación de la sentencia.*

El Juez Presidente Señor Negrón Fernández y el Juez Asociado Señor Blanco Lugo, no intervinieron. El Juez Asociado Señor Pérez Pimentel concurre en el resultado.

---

(*)A pesar de que se afirma que hablar incoherentemente es no entender bien lo que se dice, en el contrainterrogatorio se admitió que se entendieron todas las contestaciones que dio a las preguntas que la policía hizo.