EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| El Pueblo de Puerto Rico      Apelado     v.   Pedro Acevedo Estrada      Apelante | Apelación  2000 TSPR 8 |
|---|---|

Número del Caso: CR-1994-0063

Fecha: 19/01/2000

Tribunal de Primera Instancia, Sala Superior de Bayamón

Juez Ponente:  Hon. Hiram Sánchez Martínez

Abogados de la Parte Apelante: Lcdo. Marcelino Ruiz Corujo
                               Lcdo. Jesús Morales Cordero

Abogados de la Parte Apelada: Hon. Edda Serrano Blasini,
                              Subprocuradora General
                              Lcda. Eunice Amaro Garay
                              Procuradora General Auxiliar

Materia: Sustancias Controladas

Este documento constituye un documento oficial del Tribunal
Supremo que está sujeto a los cambios y correciones del
proceso de compilación y publicación oficial de las
decisiones del Tribunal. Su distribución electrónica se hace
como un servicio público a la comunidad.

| | |
|---|---|
| El Pueblo de Puerto Rico | Apelación procedente **del Tribunal Superior, Sala de Bayamón** |
| **Apelado** | |
| **v.** | **CR-94-63** |
| Pedro Acevedo Estrada | Infr. Art. 401 **Sust. Controladas** |
| **Acusado-apelante** | |

**OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ**

San Juan, Puerto Rico, 19 de enero de 2000

El presente recurso enmarca uno de varios casos producto de un operativo que se conoció como la "redada judicial". A raíz de ésta, allá para las postrimerías del año 1993, se radicaron varios cargos criminales contra funcionarios de la Rama Judicial, abogados, y ciudadanos. La investigación y procesamiento de estas personas tuvo como base, de manera principal, el testimonio de un alguacil que alegadamente actuó como "agente encubierto": Fernando L. Collazo.

La naturaleza de la prueba presentada a nivel de instancia --testimonio de un alegado agente encubierto que se limitó a establecer los

elementos mínimos del alegado delito cometido-- y la negativa del juez que presidió el proceso de instruir a los señores del jurado sobre la forma y manera en que éstos debían de evaluar dicho testimonio, <u>nos llevan a revocar la convicción decretada y a devolver el caso al tribunal de instancia para la celebración de un nuevo juicio</u>. Veamos.

I

Allá, para mayo de 1993, Fernando L. Collazo acudió a la oficina del Sr. Julio Jurado[1], sita la misma en la Oficina de la Administración de Tribunales. Collazo le expresó a Jurado que, supuestamente, el Alguacil General de San Juan quería que él investigara la conducta de un alguacil adscrito al Centro Judicial de San Juan, conocido como "Mayito". Collazo informó al Alguacil Jurado que él había aceptado la encomienda de hacer el trabajo investigativo.[2]

La investigación comenzó en el centro de trabajo en el cual laboraba el tal alguacil "Mayito": el antes mencionado Centro Judicial de San Juan. Inicialmente, Collazo reportaba el "progreso" de la investigación a funcionarios de la O.A.T. Sin embargo, luego que, alegadamente, afloraran indicios de posible conducta delictiva, el Negociado de Investigaciones Especiales (N.I.E.) del Departamento de Justicia asumió las riendas de la

---

[1] Es un alguacil investigador de la Administración de Tribunales. Entre sus funciones se encuentra la dirección de la Unidad Especial de Alguaciles. E.N.P. pág. 106.

investigación. En específico, el agente especial Eric Hernández Marrero actuó como agente supervisor de la investigación.[3] Como parte de su encomienda, Collazo gozaba de ciertos beneficios que, de ordinario, no estaban disponibles para otros alguaciles: i.e., automóvil, teléfono celular, y busca personas t/c/c "beeper", entre otros.[4]

En el Centro Judicial de San Juan, según la declaración del agente encubierto Collazo, algunos alguaciles, abogados, fiadores y hasta un juez cometieron, entre otros, delitos de soborno y oferta de soborno. Una vez se obtuvo la "prueba" con respecto a dichas personas, Collazo fue trasladado al Centro Judicial de Bayamón. Ello obedeció a que era un secreto a voces, en el Centro Judicial de San Juan, que Collazo actuaba como agente encubierto.[5]

El traslado se materializó el 3 de noviembre de 1993. Al iniciar labores en el mencionado Centro Judicial de Bayamón, Collazo alegadamente fue increpado por otros compañeros de trabajo en torno a las motivaciones de su traslado.[6] No obstante las sospechas de los propios empleados del Centro Judicial de Bayamón, tan sólo dos

---

[2] E.N.P. pág. 106.
[3] E.N.P. págs. 6 y 95.
[4] E.N.P. págs. 36 y ss.
[5] E.N.P. pág. 107.
[6] Collazo, al ser indagado en torno a su traslado, explicó a sus compañeros que el traslado se debía a una supuesta investigación que había en contra suya por haber realizado varias transacciones en el Centro Judicial de San Juan con

semanas luego del traslado, alegadamente, se concretó la transacción que hoy ocupa nuestra atención.[7]

Aun cuando, por la propia admisión de Collazo[8], el aquí apelante, Pedro Acevedo Estrada, nunca había sido conocido como persona dedicada al trasiego de drogas y sin que éste hiciera acercamiento alguno, el 17 de noviembre de 1993, a eso de las diez u once de la mañana, Collazo se acercó al Alguacil Acevedo Estrada indicándole que "estaba desesperado, que se metía cualquier cosa". Esto pues, según indicó Collazo al Alguacil Acevedo Estrada, él "estaba en un estado de depresión, de desesperación, estaba en el uso de sustancias".[9] Alegadamente, el alguacil Acevedo Estrada le contestó que "se había encontrado una marihuana en la sala de investigaciones", respondiendo Collazo: "tráemela, que yo me la meto". No se acordó precio alguno; ni tan siquiera se habló del tema.[10]

Así las cosas, al otro día, en pleno Centro Judicial, a eso de las 8:30 a.m., alegadamente se concretó la transacción. Según el testimonio de Collazo, en esa mañana los hechos ocurrieron de la siguiente manera: "...cuando iba entrando por la unidad de citaciones y arrestos,..., inmediatamente cuando yo fui entrando por la puerta, venía el Alguacil Acevedo Estrada, de frente hacia mí y de espalda hacia las personas que se encontraban en el fondo

_____

algunos funcionarios, abogados y ciudadanos. La razón para ello es que intentaba proteger su seguridad. E.N.P. pág. 7.
[7] E.N.P. pág. 7.
[8] E.N.P. pág. 35.
[9] E.N.P. pág. 7.

de la oficina. Entonces, en ese momento nos encontramos de frente y entonces siento que me dan... que me tocan los genitales, y me dice[Acevedo] "papi, de quien es eso", y al mismo, tiempo siento que me introducen algo en el bolsillo de la camisa. ... Y entonces cuando siento eso que miro, que es un pequeño sobre con cierre de presión, de esos plástico[s], que contenía algo verde, ¿no?, aparentaba ser marihuana."[11] Todo esto ocurrió a la hora de entrada de varios funcionarios del Centro Judicial y donde, como cuestión de hecho, había varios empleados que comenzaban sus labores diarias.[12] <u>Del récord se desprende que el Ministerio Público no presentó como testigo a ninguno de los presentes para corroborar algún dato de la versión del alguacil encubierto</u>.

Conforme el testimonio de Collazo, a eso de las 3:45 de la tarde, luego de recorrer las calles de la zona metropolitana durante gran parte del día, Collazo acudió al área de las celdas de confinados en el Centro Judicial de Bayamón. Allí, mientras cerraba las celdas, en un área donde, según alega, no había nadie, --<u>y sin que se hubiera acordado anteriormente precio alguno y sin que tan siquiera hubieran acordado encontrarse en dicho lugar</u>-- Collazo entregó $15.00 a Acevedo Estrada como pago por la marihuana.[13]

---

[10] E.N.P. pág. 47.
[11] E.N.P. págs. 8-9.
[12] E.N.P. págs. 49-50.
[13] E.N.P. págs. 9-10.

Pasadas las 5:00 p.m. del 18 de noviembre, Collazo se encontró con el agente especial del N.I.E. a cargo de la pesquisa y entregó el sobre plástico que, presuntamente, contenía marihuana. Acto seguido, Collazo plasmó los hechos en una declaración jurada. Cuando el agente del N.I.E., Hernández Marrero, recibió la sustancia controlada en cuestión, éste colocó sus iniciales en el sobre junto a las de Collazo. Entonces la prueba fue guardada en un armario hasta que cinco días más tarde, el 23 de noviembre, el agente del N.I.E. la llevó al Instituto de Ciencias Forenses para el análisis químico correspondiente.[14]

Allí, la sustancia fue recibida por Raquel Lugo Díaz. Esta, al recibir el sobre, apuntó el número de referencia, el número del sobre y _dos_ fechas distintas indicando el día en que recibió la evidencia: en una ocasión escribió la fecha de recibo del 18 de noviembre y en otras la del 23.[15] En cuanto al sobre que contenía la prueba, el agente del N.I.E. señaló que "la persona que recibió la evidencia hizo unas anotaciones pero que no puede decir categóricamente si esas anotaciones corresponden a las que observó en corte abierta en el mencionado documento".[16]

En el mes de diciembre de 1993, el N.I.E. llevó a cabo lo que se conoció como la "redada judicial". Entre los arrestados y/o implicados se encontraban, abogados, alguaciles, fiadores y hasta un juez. El entonces alguacil,

---

[14] E.N.P. pág. 96.
[15] E.N.P. págs. 101-102.
[16] E.N.P. pág. 99.

hoy apelante, Acevedo Estrada fue encausado por el cargo de posesión, con intención de distribuir, sustancias controladas.

Luego de varios trámites procesales, se celebró el juicio contra el apelante ante el antiguo Tribunal Superior de Puerto Rico, Sala de Arecibo. La prueba de cargo descansó, de manera principal, en el testimonio del "testigo estrella", el agente encubierto Fernando L. Collazo. En esencia, la prueba de cargo fue la que hemos vertido anteriormente según se desprende de la exposición estipulada de la prueba.

La defensa, por su parte, intentó establecer, a priori, tres puntos: el carácter mendaz del testigo; sus motivaciones aviesas para con el apelante y la buena reputación de éste. Para ello, presentó varios testigos: alguaciles, jueces y prueba documental. El jurado, en votación de 9 a 2 —uno se abstuvo— halló culpable al apelante. Aun cuando el tribunal sentenció al apelante a cinco años de prisión, lo dejó libre bajo fianza en apelación por entender que la misma tenía buenas probabilidades de éxito. Ello, según el juez que presidió el proceso, porque este Tribunal Supremo podría entender que el "veredicto rendido por el jurado en este caso no representa el balance más racional y justiciero de la prueba presentada en este caso."[17]

---

[17] Legajo núm. 2 del Apéndice, pág. 388.

En su escrito de apelación, Acevedo Estrada planteó la supuesta comisión de catorce errores, de variada naturaleza, por parte del tribunal de instancia. Posteriormente, el Procurador General compareció ante esta Curia solicitando que confirmáramos el dictamen del jurado. Habiendo examinado detenidamente el voluminoso expediente, la exposición narrativa de la prueba y los escritos de las partes, nos encontramos en posición de resolver.

## II

Por ser dispositivos del asunto ante nos, procedemos a discutir los errores duodécimo y decimotercero planteados por el apelante. Veamos.

Antes de evaluar los hechos del caso, es necesario hacer un breve preludio. No es nueva la honda preocupación que ha tenido este Tribunal con respecto a varios tipos de testimonios. Entre ellos, sólo por mencionar algunos, se encuentran los testimonios estereotipados; confidencias policíacas no corroboradas; transacciones realizadas a plena luz del día y/o a plena vista, y, en general, el testimonio de agentes encubiertos. Pueblo v. Ruiz Negrón, 113 D.P.R. 17 (1982); Pueblo v. Sanabria Pérez, 113 D.P.R. 694, 696, n.2 (1983); Pueblo v. Rodríguez Sánchez, 109 D.P.R. 243 (1979).

Recientemente, en Pueblo v. Meléndez Clay y otros, 99 TSPR 94, res. el 16 de junio de 1999, reiteramos la norma de que, en nuestra jurisdicción, "el uso de declaraciones

estereotipadas por cualquier tipo de testigo, en este caso agentes del orden público, <u>debe ser objeto de escrutinio riguroso</u> para evitar que declaraciones falsas o inexactas, vulneren derechos de ciudadanos inocentes." Hemos definido el testimonio estereotipado como aquel que se ciñe a establecer "...los elementos mínimos necesarios para sostener un delito sin incluir detalles imprescindibles para reforzarlos." <u>Pueblo</u> v. <u>Rivera Rodríguez</u>, 123 D.P.R. 443, 480 (1989).[18]

Por otro lado, y en referencia general a los casos en que la prueba de cargo consiste, de manera principal, en el testimonio de un agente encubierto, hemos expresado en reiteradas ocasiones que no obstante reconocer la necesidad de la utilización de estos agentes en la guerra contra el

---

[18] Hace más de veinticinco años, fijamos los parámetros esenciales para examinar la credibilidad de un testimonio estereotipado. Estos son:

1. El mismo debe ser escudriñado con especial rigor.
2. Tanto los casos de "la evidencia abandonada" o "lanzada al suelo" como los casos del "acto ilegal a plena vista" deben, en ausencia de otras consideraciones, inducir sospecha de la posible existencia de testimonio estereotipado.
3. Cuando el testimonio es inherentemente irreal o improbable debe rechazarse.
4. El testimonio estereotipado puede perder su condición de tal si, yendo más allá de los datos indispensables para probar los requisitos mínimos de un delito, se le rodea de las circunstancias en que funciona el agente, el término de su investigación, los resultados obtenidos fuera del caso en trámites y otros detalles.
5. La presencia de contradicciones o vaguedades en el testimonio debe tender a reforzar el recelo con que hay que escuchar esta clase de declaraciones.

crimen, dicha práctica "...no deja de ser un tanto inquietante por cuanto implica, en la gran mayoría de los casos, que un ciudadano puede ser acusado, condenado y sentenciado a prisión por un gran número de años, exclusivamente a base de la declaración, no corroborada en cuanto a los hechos esenciales de la misma, del agente encubierto." Pueblo v. Sanabria Pérez, 113 D.P.R. 694 (1983). De ahí, la razón para haber expresado, en innumerables ocasiones, que el testimonio de un agente encubierto debe ser examinado, o escudriñado, con especial rigor. Pueblo v. González del Valle, ante.

Este breve preludio nos sirve de base para evaluar uno de los errores señalados por la defensa: las instrucciones especiales al jurado. En el caso de autos, concluido el desfile de prueba, llegó la crucial etapa de instrucciones al jurado. En ese momento, la defensa, por escrito[19], solicitó al juez que impartiera una instrucción especial en cuanto al modo de evaluar el testimonio de agentes encubiertos. El tribunal se negó a brindar la instrucción.[20]

La pauta general en torno a instrucciones al jurado impone que se cubran los elementos esenciales de las defensas presentadas por el acusado, así como los aspectos de derecho que, bajo cualquier teoría razonable, pudieran estar presentes en las deliberaciones. Esto, aunque la

---

Pueblo v. González del Valle, 102 D.P.R. 374 (1974); Pueblo en interés de los menores A.L.R.G. y F.R.G., 132 D.P.R. 990 (1993); Pueblo v. Meléndez Clay y otros, ante.

[19] Págs. 275-277 del Legajo núm. 2.

[20] Id., pág. 272.

prueba de defensa sea débil, inconsistente o de dudosa credibilidad. Pueblo v. Miranda Santiago, 130 D.P.R. 507, 518 (1992). "Ello es así porque corresponde al jurado y no al tribunal rendir un veredicto conforme a la ley y los hechos del caso, según aquél aquilate la prueba y determine los hechos." Pueblo v. González Colón, 110 D.P.R. 815 (1991). Dicho de otra manera, para asegurar que el desenlace del proceso adversativo este guiado por el derecho y los hechos, es imprescindible que el jurado, al aquilatar la prueba, cuente con las instrucciones apropiadas. Sólo así el veredicto será, cualquiera que fuese, uno justo.

No es costumbre que dictemos pautas cuando de instrucciones especiales al jurado se trata. Ello obedece a una razón relativamente sencilla: las instrucciones especiales dependen, casi exclusivamente, de los hechos particulares del caso en cuestión y/o las defensas que se presenten en el mismo. Toda vez que estos pueden ser tan variados como la experiencia humana, las instrucciones especiales también así lo serán. Así pues, por consideraciones pragmáticas, es irreal establecer por adelantado qué instrucción especial procede en cada uno de los escenarios. Esta determinación debe hacerse caso a caso.

Nos compete examinar si en el presente caso, a la luz de los hechos particulares del mismo, la instrucción solicitada era procedente en derecho. Por último, hay que

ponderar si, al omitir la instrucción, se privó al acusado de un juicio justo e imparcial. Cf. Pueblo v. Torres García, res. el 19 de septiembre de 1994, 137 D.P.R. (1994)[21]; Pueblo v. Miranda Santiago, ante; Pueblo v. Saenz Forteza, 100 D.P.R. 956 (1972). Como puede notarse ambos aspectos están un tanto entrelazados.

La teoría de defensa, en cuanto a este aspecto, fue neurálgica. El apelante Acevedo Estrada primero, intentó establecer un patrón de mendacidad de parte de Collazo. Durante el contrainterrogatorio, confrontó al testigo con prueba específica de conducta tendente a demostrar la mendacidad del testigo encubierto Collazo. Como segundo eslabón, Acevedo presentó prueba de que la versión de Collazo, actuando como agente encubierto, era falsa puesto que a la hora y fecha de los hechos --ya fuese cuando se acordó la transacción;  se hizo la entrega; o el pago-- las circunstancias eran diametralmente opuestas a las descritas por éste. Por último, el acusado presentó prueba tendente a establecer la turbia motivación del "agente encubierto" para con él.

La instrucción solicitada, en consecuencia, giraba en torno a un asunto esencial de la teoría principal de la defensa: la mendacidad del testigo. Somos del criterio que la instrucción a los efectos de que el testimonio de

---

[21] Debe señalarse que en Torres García, ante, al mencionar que el apelante no había evaluado las instrucciones por lo que no podía evaluarse su planteamiento, expresamos que "[d]ifícilmente podemos caracterizar la prueba como floja,

Collazo debía examinarse con cautela y que el jurado debía analizar qué aspectos, si alguno, otorgaban confiabilidad al, y/o corroboraban el, relato de Collazo era imprescindible. En fin, somos del criterio que el tribunal debió haber impartido la instrucción oportunamente solicitada por Acevedo Estrada y que erró al así no hacerlo.

Como es sabido, hemos resuelto que procede la revocación de una convicción, si el error al omitir, o impartir, la instrucción en controversia es de tal naturaleza que de no haberse cometido, probablemente, el resultado del juicio hubiera sido distinto o cuando el error cometido viola derechos fundamentales o sustanciales del acusado. Pueblo v. Miranda Santiago, ante, citando a Pueblo v. Torres Rodríguez, 119 D.P.R. 730 (1987). Somos del criterio que este es uno de esos casos.

Recordemos que la votación del jurado en el presente caso estuvo tan cerrada como es posible.[22] Como jueces apelativos, muchas veces somos llamados a "ponernos en el sitio del jurado" para dilucidar asuntos como este. Huelga decir que es sumamente difícil tal ejercicio pues el mismo conlleva cierto grado de especulación: nadie puede afirmar con certitud cómo hubiera reaccionado el jurado, al deliberar, si hubiese contado con el insumo de cierta

_____

descarnada, estereotipada, inverosímil o insuficiente." Dicho caso dista en demasía del de autos.

[22] Como relatáramos antes, el jurado rindió veredicto de culpabilidad por la escasa mayoría de 9 a 2, con una abstención, la que se cuenta como un voto para absolver.

prueba o, como en el caso ante nos, si se les hubiese instruido en cuanto a la forma de evaluar el testimonio de un agente encubierto. Sin embargo, e independientemente de la complejidad del ejercicio al que somos llamados a realizar como foro apelativo, no podemos abdicar nuestra responsabilidad: tenemos que necesariamente determinar la posible influencia que pudo haber tenido en la mente del jurado la instrucción solicitada y no ofrecida.

Nótese que la función de un agente encubierto es ganar la confianza del sospechoso de forma tal que éste se apreste a realizar transacciones criminosas. Por ello, en el caso de autos, el juzgador tenía que evaluar, entre otras cosas, si, a la luz de la prueba presentada, existía tal confianza. Dentro de ese contexto, jugaba un papel importante la instrucción solicitada por la defensa y que el foro de instancia erróneamente excluyó. Si, cómo norma, el testimonio de agentes encubiertos debe ser examinado con cautela, ¿cómo debe evaluarse el de uno que, amén de lo anterior, supuestamente, había tenido un problema personal con el acusado? Debemos recordar que esa fue parte de la prueba de defensa presentada por Acevedo Estrada.

Los tribunales deben tener especial cuidado cuando de instrucciones al jurado se trata puesto que trascienden el ámbito del derecho probatorio e inciden en garantías constitucionales de los acusados.[23] Dado la naturaleza de la

_____

[23] Artículo II, Sección 11 de la Constitución del Estado Libre Asociado de Puerto Rico.

prueba presentada por el Estado, el carácter medular de la teoría de defensa en cuanto a la instrucción solicitada y la cerrada votación del jurado al determinar la culpabilidad del apelante, entendemos que el resultado del juicio pudo haber sido distinto de haberse brindado la instrucción.

**En resumen**, determinamos que procede revocar la convicción decretada en el presente caso, y devolver el mismo al tribunal de instancia para la celebración de un nuevo juicio por razón del tribunal sentenciador haber errado al no trasmitir al jurado la instrucción solicitada a los efectos de que el testimonio del testigo principal de cargo debía ser examinado por ellos con cautela; ello en vista de que la prueba presentada por la defensa --tendente a demostrar mendacidad y motivos aviesos de parte del principal testigo de cargo-- así lo hacía necesario.

### III

Esta determinación encuentra apoyo, **además**, en la fragilidad de la propia prueba de cargo; hecho que, unido a la prueba de defensa presentada, **fortalece** nuestra determinación. Veamos.

La evaluación de la prueba por parte de un foro apelativo tiene ciertas limitaciones. Sin embargo, en casos de naturaleza penal, éstas deben sopesarse y analizarse cuidadosamente <u>de forma tal que no se vulnere el derecho constitucional de un acusado a que su culpabilidad se establezca más allá de duda razonable</u>.

Al revisar cuestiones de hecho en convicciones criminales, <u>este Tribunal se ha guiado por un principio básico en nuestra jurisdicción</u>: la apreciación de la prueba corresponde al foro sentenciador y los tribunales apelativos sólo intervendrán con ella cuando exista error manifiesto, pasión, prejuicio o parcialidad. <u>Pueblo</u> v. <u>Maisonave</u>, 129 D.P.R. 49, 62-63 (1991).

La norma descansa en el hecho de que los foros de instancia están en mejor posición para evaluar la prueba desfilada, pues tienen la oportunidad de observar y escuchar a los testigos y, por ello, su apreciación merece gran respeto y deferencia. <u>Pueblo</u> v. <u>Rosario Reyes</u>, res. el 7 de junio de 1995, 138 D.P.R. ___ (1995); <u>Pueblo</u> v. <u>Cabán Torres</u>, 117 D.P.R. 645 (1986); <u>Pueblo</u> v. <u>Ríos Álvarez</u>, 112 D.P.R. 92 (1982). Así pues, a menos que existan los elementos antes mencionados y/o que la apreciación de la prueba se distancie de la realidad fáctica o ésta sea inherentemente imposible o increíble, el tribunal apelativo <u>deberá abstenerse</u> de intervenir con la apreciación de la prueba hecha por el juzgador de los hechos. <u>Pueblo</u> v. <u>Maisonave</u>, ante; <u>Pueblo</u> v. <u>Rivero, Lugo y Almodóvar</u>, 121 D.P.R. 454 (1988); <u>Pueblo</u> v. <u>De Jesús Rivera</u>, 113 D.P.R. 817, 826 (1983). En otras palabras, las determinaciones que hace el juzgador de los hechos <u>no</u> deben ser descartadas arbitrariamente <u>ni</u> tampoco deben sustituirse por el criterio del foro apelativo, <u>a menos que</u> de la prueba

admitida surja que no existe base suficiente que apoye tal determinación. <u>Pueblo</u> v. <u>Maisonave</u>, ante.

Específicamente, en casos de naturaleza penal, hemos requerido, para que pueda obtenerse una convicción válida en derecho que derrote la presunción de inocencia que asiste a todo acusado, que es un requisito *sine qua non* que el Estado presente prueba respecto a cada uno de los elementos del delito, su conexión con el acusado y la intención o negligencia criminal de éste último. Como es sabido, lo anterior debe establecerse más allá de duda razonable. <u>Pueblo en interés de F.S.C.</u>, 128 D.P.R. 931, 941 (1991); <u>Pueblo</u> v. <u>Ramos y Álvarez</u>, 122 D.P.R. 287 (1988); <u>Pueblo</u> v. <u>Cabán Torres</u>, 117 D.P.R. 645, 652 (1986); <u>Pueblo</u> v. <u>Bigio Pastrana</u>, 116 D.P.R. 748, 760-61 (1985).

La prueba del Ministerio Público "tiene que ser satisfactoria, es decir, prueba que produzca certeza o convicción moral en una conciencia exenta de preocupación o en un ánimo no prevenido." <u>Pueblo</u> v. <u>Rodríguez Román</u>, 128 D.P.R. 121, 131 (1991); <u>Pueblo</u> v. <u>Narváez Cruz</u>, 121 D.P.R. 429 (1988); <u>Pueblo</u> v. <u>Carrasquillo Carrasquillo</u>, 102 D.P.R. 545, 552 (1974). Así pues, la insatisfacción de la conciencia del juzgador con esa prueba produce lo que conocemos como duda razonable. <u>Pueblo</u> v. <u>Cabán Torres</u>, ante, 652; <u>Pueblo</u> v. <u>Toro Rosas</u>, 89 D.P.R. 169, 175 (1963).

Por ello, siendo la apreciación de la prueba desfilada en un juicio una cuestión entrelazada de hecho y de derecho, determinar si se probó la culpabilidad de un

acusado más allá de duda razonable es revisable como cuestión de derecho. Pueblo v. Rivero Lugo y Almodóvar, ante, pág. 472; Pueblo v. Cabán Torres, ante, pág. 653; Pueblo v. Pagán Díaz, 111 D.P.R. 608 (1981).

Claro está, el marco de acción limitado, a nivel apelativo, con respecto a la apreciación de la prueba, no implica que el foro recurrido sea inmune al error; tampoco que, so color de la deferencia y el carácter repetitivo del tipo de planteamiento que hoy enfrentamos, haremos caso omiso a los errores que se hayan cometido en el foro de instancia. Pueblo v. Pagán Díaz, ante, pág. 621. De hecho, y aun cuando ello no ocurre frecuentemente, hemos revocado sentencias en las cuales las determinaciones de hecho, aunque sostenidas por la prueba desfilada, no establecen la culpabilidad del acusado más allá de duda razonable. Pueblo v. Meléndez Rolón, 100 D.P.R. 734 (1972); Pueblo v. Rivera Arroyo, 100 D.P.R. 46 (1971); Pueblo v. Díaz Just, 97 D.P.R. 59 (1969).

Es por ello que no vacilaremos en dejar sin efecto "un fallo condenatorio cuando un análisis de la prueba que tuvo ante sí el tribunal sentenciador nos deja serias dudas, razonables y fundadas, sobre la culpabilidad del acusado." Pueblo v. González Román, res. el 20 de junio de 1995, 138 D.P.R. ___ (1995). (Subrayado nuestro.)

A esos efectos, debemos recordar las palabras que emitiera este Tribunal hace más de veinte años:

"Hasta tanto se disponga de un método infalible para averiguar sin lugar a dudas dónde

está la verdad, su determinación tendrá que ser una cuestión de conciencia. Ese deber de conciencia no para en el fallo del tribunal sentenciador. <u>Nosotros también tenemos derecho a tenerla tranquila</u>.

<u>Cuando de aquilatar la prueba se trata es difícil a veces trazar una línea demarcadora entre cuestiones de hechos y cuestiones de derecho</u>. Las pruebas son hechos pero su análisis pone en movimiento, además de la experiencia del juzgador, su conocimiento del Derecho para así llegar a una <u>solución justa</u> de la controversia."[24]

Teniendo todo lo anterior en mente, evaluamos si en el caso ante nuestra consideración el juzgador de los hechos pudo haber rendido un veredicto absolutorio, <u>de haber sido instruido correctamente por el tribunal</u>, por razón de duda razonable. Debemos reconocer que los ciudadanos que componen el mismo, al igual que a veces sucede con los jueces que presiden los juicios por tribunal de derecho, también pueden cometer un error manifiesto. Por supuesto, existe una mayor probabilidad de error cuando el jurado ha recibido instrucciones erróneas o, como en el caso de autos, el juez se niega a impartir una instrucción especial que resulta procedente en derecho. Examinamos la prueba presentada.

Antes de ingresar a la Rama Judicial, el testigo Collazo se desempeñó en el servicio público, específicamente en la Administración de Corrección. De su puesto como guardia penal, Collazo fue <u>destituido</u> por haber incurrido en <u>conducta delictiva</u> en los propios predios de

la institución. Durante el juicio, la defensa, como procede hacer cuando se pretende impugnar un testigo con prueba extrínseca[25], ofreció a éste la oportunidad de negar o aceptar la verdad de lo aseverado. Sin embargo, sorpresivamente, Collazo insistió que no fue destituido, aseveración que no es cierta.[26] Por otro lado, tenemos que el alguacil Collazo, al ingresar a la Rama Judicial omitió, en su solicitud de empleo, deliberadamente el antes mencionado hecho.[27]

Tiempo después de ingresar a la Rama Judicial, Collazo acudió a la O.A.T. para "denunciar actos de corrupción"; se ofreció para investigar el asunto como agente encubierto. Luego de permitírsele tal actuación, Collazo comenzó a recibir, repetimos, ciertos "beneficios marginales", tales como un automóvil alquilado, un teléfono celular y un busca personas (beeper).[28]

---

[24] Pueblo v. Carrasquillo Carrasquillo, 102 D.P.R. 545, 551-551 (1974). (Énfasis suplido.)

[25] Regla 47(b) de Evidencia, 32 L.P.R.A. Ap. IV, R. 47(b).

[26] En carta fechada el 28 de enero de 1982, el Administrador de Corrección, Sr. Charles Jiménez Nettleship, destituyó de su empleo a Collazo por poseer un revólver en la Penitenciaría Estatal sin estar debidamente autorizado para poseerlo o portarlo. Legajo núm. 1 del Apéndice, pág. 28 y ss.

[27] Uno de los testigos de defensa fue el alguacil Domingo Moyeno Molina. Éste entrevistó a Collazo para otorgarle el puesto de alguacil. Durante la misma, según el testimonio no contradicho de este testigo, se le preguntó a Collazo si había sido destituido anteriormente del servicio público; éste contestó que no. De paso, Moyeno Molina señaló que, como Alguacil General, "estaba obligado a rechazar las solicitudes de aquellos candidatos que hubiesen sido destituidos previamente del servicio público." E.N.P. pág. 116.

[28] E.N.P. págs. 36 y ss.

Iniciada la pesquisa en el Centro Judicial de San Juan, Collazo, alegadamente, "obtuvo" prueba incriminatoria que involucraba a abogados, fiadores, alguaciles y hasta un juez en actos delictivos. Luego que circulara información en el sentido de que actuaba como agente encubierto, Collazo fue trasladado al Centro Judicial de Bayamón. Allí, a sólo dos semanas de haber sido trasladado, y no obstante las sospechas e inquisiciones en torno a su traslado por parte de sus compañeros de trabajo, alegadamente realizó la compraventa de drogas con el apelante.

Collazo declaró que cuando informó al apelante que estaba deprimido y usando sustancias controladas, "que se metía cualquier cosa", fue a eso de las diez u once de la mañana, aunque no estaba muy seguro. La prueba de defensa, sin embargo, estableció que el apelante Acevedo Estrada fungió como alguacil de sala, hasta las once y media de la mañana, en la sala 403.[29]

Por otra parte, la alegada transacción ocurrió en las instalaciones del tribunal, a plena hora de entrada de los empleados y sólo a pasos de una sala donde varios funcionarios se disponían a comenzar sus faenas. En este cuadro, supuestamente, el apelante colocó la bolsita de marihuana en el bolsillo de Collazo mientras expresaba la frase "papi de quién es eso", mientras realizaba la *conspicua* acción de tocar los genitales de Collazo.

_____

Aparentemente, nadie más observó la supuesta transacción. De hecho, el Estado no pudo producir ningún testigo adicional que corroborara tan siquiera el haber visto a Collazo junto al aquí apelante en dicho día.

El pago por la sustancia controlada supuestamente se llevó a cabo en un escenario todavía más controversial. Según Collazo, aun cuando en ningún momento se había hablado de dinero o algún tipo de remuneración, él le pagó la marihuana ($15.00) a Acevedo en el área de la unidad de confinados (sótano) del mencionado centro judicial. Testificó Collazo que el pago ocurrió a eso de las 3:30 p.m. y que allí no había ni un alma. La defensa estableció, sin embargo, con copiosa prueba, que era falso lo aseverado por el testigo. Esto, porque las celdas estaban llenas de confinados a la mencionada hora.[30]

---

[29] Testimonio del Alguacil General Auxiliar, Sr. Angel M. Bermúdez Agosto, pág. 122 de la E.N.P. Ello, de acuerdo al registro que se lleva a tales efectos.

[30] Para establecer dicho hecho la defensa presentó prueba testifical y documental. Por ejemplo, el testimonio del alguacil José Flores, quien, para la fecha de los hechos, estaba asignado a la Unidad de Confinados, y quien, además de explicar que por las tardes se llevan al tribunal los confinados citados para "conferencia", para que puedan ser entrevistados por los abogados de la Sociedad para Asistencia Legal, expresó que la tarde en cuestión había de diez a quince confinados en las celdas. Además, señaló que el proceso de entrevistas ese día concluyó de 3:30 a 4:00 de la tarde. Asimismo, la defensa presentó al custodio del libro de registro del Centro Judicial de Bayamón el cual reflejaba que, en la tarde del día en que se efectuó el alegado pago, había once confinados para conferencia y otros que habían permanecido para vistas que se celebrarían en la tarde. En específico, señaló el custodio que esa tarde había aproximadamente treinta confinados en el área. Véase: E.N.P. págs. 113 y 123.

¿Qué motivación pudo haber tenido Collazo para inducir al apelante, Acevedo Estrada, a que le "vendiera" marihuana? No sólo Acevedo Estrada no era conocido como una persona que distribuyese sustancias controladas, en o fuera del tribunal, sino que, durante el juicio, desfiló prueba incontrovertida en torno a las malas relaciones personales entre ambos. En específico, se estableció que habían tenido un serio incidente en relación con un ciudadano que había sido arrestado ilegalmente debido a una confusión en torno a la identidad del arrestado.[31]

Finalmente, debemos destacar que algunos jueces del Tribunal de Primera Instancia, que evaluaron el testimonio de Collazo en otros casos relacionados con la llamada "redada judicial", hicieron diversas y serias manifestaciones y determinaciones judiciales negativas con respecto a éste. Tres jueces, que intervinieron en casos donde Collazo fue el testigo principal de cargo, y que fueron testigos de defensa en este caso, señalaron que éste había mentido ante ellos.[32]

---

[31] A esos efectos, el Alguacil Salgado Marrero testificó que Acevedo y Collazo no se hablaban a raíz del mencionado incidente; "entre ellos no había ninguna relación".[31] Por otro lado, el Alguacil Sánchez Laureano ratificó que hubo un incidente entre Collazo y Acevedo que tornó las relaciones negativas. Para la fecha en que supuestamente ocurrieron los hechos, Sánchez Laureano señaló que las relaciones entre ellos estaban tan deterioradas que Collazo y Acevedo ni se hablaban. Véase: E.N.P. Págs. 112, 121-122.

[32] Hons. José A. Torres Caraballo y José A. Caquías Mendoza. Este último señaló que se había inhibido de seguir presidiendo vistas preliminares de otros casos de la misma redada porque "le resultaba difícil darle crédito a Collazo" debido a que éste había faltado a la verdad en el

En fin, resulta, cuando menos, un tanto difícil de aceptar la teoría del Estado en el presente caso. Tenemos, de testigo principal, a una persona con historial de mendacidad que, incluso, niega en corte abierta un hecho indiscutiblemente cierto; testigo cuyo testimonio, en casos relacionados, ha sido rechazado como falso por experimentados y competentes magistrados. Ese testigo narra una historia que, aun cuando no imposible, resulta difícil de creer y aceptar; esto es, que una persona, el apelante, que prácticamente no tenía relación alguna con él --de hecho, no se hablaban debido a un problema surgido entre ellos-- y que no era conocido como traficante de sustancias controladas, le "regala" o vende cierta cantidad de marihuana, llevándose a cabo el traspaso de la droga, y el pago de la misma, en circunstancias que son desmentidas y/o no son corroboradas por otros funcionarios públicos. Si a ello le añadimos que era de conocimiento público que ese testigo era un "agente encubierto", la historia narrada por éste causa en nuestras consciencias serias interrogantes. Cf. <u>Pueblo</u> v. <u>González Román</u>, ante.

En fin, nos enfrentamos a una prueba de cargo, cuando menos, frágil que se limita a establecer los elementos

---

testimonio vertido en ciertas vistas preliminares de la misma redada.

Por otro lado, la Hon. Ygrí Rivera de Martínez, habiendo evaluado el testimonio de Collazo con relación a este mismo operativo, tildó al mismo de "profesional en el campo de la intriga, de la manipulación, y de todas esas cosas que desgraciadamente perduran hoy día en las personas

mínimos del delito imputado. Por otro lado, la prueba de defensa es una que tiende a demostrar que dicha prueba no es cierta.

Esto, unido al hecho de que el tribunal de primera instancia se negó a instruir al jurado en cuanto a la forma en que debía evaluarse el testimonio del testigo principal de cargo, nos lleva a concluir que, cuando menos, procede la celebración de un nuevo juicio.

A tenor con todo lo antes expuesto, procede revocar la sentencia que condenó al apelante, Pedro Acevedo Estrada, por infracción al Artículo 401 de la Ley de Sustancias Controladas, devolviéndose el caso al foro de instancia para la celebración de un nuevo juicio en el caso de autos.

---

que buscan satisfacer sus intereses a costa de lo que sea".
Apéndice IV, pág. 12.

Se dictará Sentencia de conformidad.


FRANCISCO REBOLLO LÓPEZ
JUEZ ASOCIADO

t

En el Tribunal supremo de puerto rico

| | |
|---|---|
| El Pueblo de Puerto Rico<br><br>**Apelado**<br><br>**v.**<br><br>Pedro Acevedo Estrada<br><br>**Acusado-apelante** | Apelación procedente<br>**del Tribunal Superior,**<br>**Sala de Bayamón**<br><br>CR-94-63<br><br>Infr. Art. 401<br>**Sust. Controladas** |

SENTENCIA

**San Juan, Puerto Rico, 19 de enero de 2000**

**Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia revocatoria de la emitida por la Sala de Bayamón del antiguo Tribunal Superior de Puerto Rico; devolviéndose el caso al foro de instancia para la celebración de un nuevo juicio en el caso de autos.**

**Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Presidente señor Andréu García y el Juez Asociado señor Negrón García inhibidos. La Juez Asociada señora Naveira de Rodón disiente sin opinión. El Juez Asociado señor Fuster Berlingeri no intervino.**

**Isabel Llompart Zeno**
**Secretaria del Tribunal Supremo**