Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL[1]

| EL PUEBLO DE PUERTO RICO Apelado v. WILFREDO RIVERA MARRERO Apelante | KLAN202200099 | APELACIÓN Procedente del Tribunal de Primera Instancia, Sala Superior de **Ponce** Criminal Núm.: JVI2016G0036 JVI2016G0037 JLA2016G0191 Sobre: **Art. 93 del C.P. y otros** |
|---|---|---|

Panel integrado por su presidente el Juez Rivera Torres, la Juez Santiago Calderón, la Juez Álvarez Esnard y el Juez Pérez Ocasio

Pérez Ocasio, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 16 de junio de 2025.

Comparece ante nos, Wilfredo Rivera Marrero, en adelante, Rivera Marrero o apelante, solicitando que revisemos la *"Sentencia"* del Tribunal de Primera Instancia, Sala Superior de Ponce, en adelante, TPI- Ponce, del 18 de enero de 2022. En el referido dictamen, el apelante fue encontrado culpable por varios delitos.

Por los fundamentos que expondremos a continuación, *confirmamos la sentencia apelada.*

**I.**

Por eventos acaecidos en el Municipio de Santa Isabel, Puerto Rico, el 6 de agosto de 2016 entre las 5:45 p.m. y 5:50 p.m., y que resultaron en la muerte de los hermanos Héctor Rivera Torres y Roberto Rivera Torres, el 7 de octubre de 2016, el Ministerio Público

---

[1] Véase Orden Administrativa OATA-2023-131 del 5 de julio de 2023, donde se designa al Juez Alberto Luis Pérez Ocasio en sustitución de la Juez Olga E. Birriel Cardona.

Número Identificador
SEN2025_____

radicó tres (3) denuncias en contra del apelante: dos (2) infracciones al Artículo 93 (a) del Código Penal de Puerto Rico, en adelante, Código Penal, 33 LPRA sec. 5142, y una (1) infracción al Artículo 5.04 de la derogada Ley de Armas de Puerto Rico, en adelante, Ley de Armas, 25 LPRA ant. sec. 458c.[2] El mismo día, el magistrado determinó *causa para arresto* en todos los cargos, luego de evaluar la declaración jurada hecha por el agente Ángel López Sánchez, en adelante agente López Sánchez. Igualmente, se le fijó una fianza de trescientos mil dólares ($300,000.00), la cual no prestó.

Así, el 10 de noviembre de 2016, el TPI-Ponce celebró la *Vista Preliminar*, en la cual el apelante estuvo representado por la Sociedad para Asistencia Legal. En la vista, el TPI-Ponce determinó *causa probable para acusar* al apelante por los delitos imputados. Por ello, el 16 de noviembre de 2016, el Ministerio Público presentó las acusaciones correspondientes por los delitos de epígrafe. En los pliegos acusatorios, se acusó a Rivera Marrero de haberle causado la muerte, a propósito, con conocimiento, y utilizando un arma de fuego, a Héctor Rivera Torres y a Roberto Rivera Torres mediante varios disparos. Igualmente, el Ministerio Público presentó un "*Pliego de Agravantes*", en el cual alegó que eran de aplicación los incisos (K), (L) y (O) del Artículo 66 del Código Penal, supra, sec. 5099, al igual que los incisos (b)(1)(A), (B) y (D) de la Regla 171 de Procedimiento Criminal, 34 LPRA Ap. II, R. 171.

Posteriormente, el 17 de noviembre de 2016, se celebró el acto de la *Lectura de Acusación*, a la cual compareció el apelante. Así las cosas, el 4 de enero de 2017, la defensa informó que el juicio se ventilaría ante un Jurado.

---

[2] Los hechos esbozados en la primera parte de esta sentencia son extraídos de los autos originales que obran en nuestro expediente, lo cuales recibimos el 27 de febrero de 2025.

Luego de un periodo de descubrimiento de prueba extenso y múltiples *Conferencias con Antelación al Juicio*, el 27 de enero de 2017, el apelante presentó una *"Moción Solicitando Supresión de Evidencia"*. En su escrito, Rivera Marrero solicitó la supresión de la Orden de Registro y Allanamiento expedida el 5 de octubre de 2016 del *"Teléfono Celular Compañía Claro Número (787-203-2449)"*, y toda la evidencia que fue obtenida a través de la misma, por ser esta *insuficiente de su propia faz* y en contravención al Artículo II, Sección 10, de la Constitución de Puerto Rico, Art. II, Sec. 10, Const. PR, LPRA, Tomo 1, y la Cuarta Enmienda de la Constitución de Estados Unidos, Const. EE. UU., LPRA, Tomo 1. Dicha Orden se hace formar parte en este escrito:

**ESTADO LIBRE ASOCIADO DE PUERTO RICO**
**TRIBUNAL GENERAL DE JUSTICIA**
**TRIBUNAL DE PONCE**
SALA DE _____

EL PUEBLO DE PUERTO RICO          *
                                  *       Por:
                                  *       INVESTIGACION DOBLE ASESINATO
                                  *       #QUERELLA 2016-3-069-02093
                                  *
Vs.                               *
TELEFONO CELULAR COMPAÑIA         *
CLARO NUMERO (787) 203-2449       *

**ESTADOS UNIDOS DE AMÉRICA, EL PRESIDENTE DE LOS ESTADOS UNIDOS DE AMÉRICA AL PUEBLO DE PUERTO RICO, A CUALQUIERA DE LOS AGENTES DEL ORDEN PUBLICO, POLICIA DE PUERTO RICO, EN EL DISTRITO DE PONCE**

**ORDEN DE REGISTRO TELEFONO CELULAR (787) 203-2449**

El Pueblo de Puerto Rico, al Jefe de la Policía de Puerto Rico o a uno de sus agentes en el Cuerpo de Investigaciones Criminales, Adscrito a la División de Homicidios de Ponce, habiéndose presentado prueba acreditativa en este día, por medio de declaración jurada y firmada por el Agte. Angel A. Lopez Sanchez placa 24382, quien fue examinado por mí. De la Declaración del agente Lopez Sanchez, se desprende lo siguiente:

En Ponce Puerto Rico, a __5__ de octubre de 2016, ante este Honorable Tribunal comparece el Agte. Angel A. Lopez Sanchez palca 24382, vecino de San German, Puerto Rico y previo juramento conforme a la ley; declara:

Que trabaja para la Policía de Puerto Rico, adscrito a la División Homicidios de Ponce, Puerto Rico.

El día 6 de agosto de 2016, tomó servicio a las 5:00 de la tarde en la oficina de Homicidios Ponce. Recibió una llamada a las 6:15 pm aproximadamente del supervisor del turno el Sgto. Alarcon, del CIC de Yauco, para que él fuera a una escena de asesinato de dos personas muertas en el pueblo de Santa Isabel, ocurrido a las 5:40 pm en el Sector Lomas del Expreso final Carretera 153 Interior en Santa Isabel, que luego fueron identificados como **Héctor G. Rivera Torres y Roberto C. Rivera Torres**, ambos hermanos y residentes de los pueblos de Aibonito y Barranquitas respectivamente.

El día 6 de agosto de 2016, tomó servicio a las 5:00 de la tarde en la oficina de Homicidios Ponce. Recibió una llamada del supervisor del turno el Sgto. Alarcon, del CIC de Yauco, para que me dirigiera a una escena relacionado a dos personas que resultaron muertas por heridas de balas en el pueblo de Santa Isabel, ocurrido a las 5:40 pm en el Sector Lomas del Expreso final Carretera 153 Interior en Santa Isabel, que luego fueron identificados como **Héctor G. Rivera Torres y Roberto C. Rivera Torres**, ambos hermanos y residentes de los pueblos de Aibonito y Barranquitas respectivamente.

De la investigación se desprende que el joven Héctor G. Rivera tenía en su poder un teléfono celular Marca Samsung Modelo Galaxy Edge color metálico con cover negro y bordes rojos, con el número de teléfono asignado (939)274-1300 de la Compañía Claro, según información suministrada por su pareja consensual Terenith Negrón Cartagena. Dicho teléfono celular no se recuperó en la escena de los asesinatos.

Se obtuvo mediante subpoena el registro de llamadas del número de teléfono (939)-274-1300 la cual fue provista por la Compañía Claro y de la misma se pudo detectar un número de teléfono (787)- 203-2449. Se desprende del listado de llamadas del (939) 274-1300, que entre los días 4 y 6 de agosto de 2016, hubo múltiples llamadas entre

los teléfonos (939) 274-1300 y (787)- 203-2449. El día 6 de agosto de 2016, fecha en que ocurrieron los asesinatos, hubo comunicación con los poseedores de ambos teléfonos hasta poco minutos antes del asesinato de los señores Rivera Torres.

Por lo antes expuesto el que suscribe solicita autorización judicial para registrar el número de teléfono (787) 203-2449, desde el día 1 de agosto al 3 de septiembre de 2016 con el propósito de verificar: mensajes de texto, el registro de las llamadas realizadas y recibidas, y los mensajes texto y mensajes de voz multimedia la aplicación WhatsApp, especificando el consumo del teléfono diario respecto a dicha aplicación. Además se solicita se especifica a nombre de quien aparece la cuenta de este teléfono y la dirección postal y física entre las fechas del 1 de agosto al 3 de septiembre de 2016. Se solicita además el registro de los teléfonos (787)-203-2449 y (939)-274-1300 respecto a la triangulación de ambos números del mismo el día 6 de agosto de 2016, entre las 5:00 de la tarde a 12:30 de la media noche del día 7 de agosto de 2016.

Por los fundamentos antes expuestos, muy respetuosamente solicito de vuestro Honor y del Honorable Tribunal que de la manera declarada por mí, si existe causa probable para el registro del celular antes descrito, por ser un equipo de comunicaciones donde se realizaron varias llamadas entres los números de teléfono (939) 274-1300 y (787) 203-2449, dias antes y el mismo día del asesinato. Sírvase vuestro Honor autorizar una orden de registro de los dias 1 de agosto al 3 de septiembre de 2016, para obtener los mensajes de textos así como el registro de llamadas realizadas y recibidas, mensajes de textos y mensajes de voz multimedia, por la aplicación Whatsapp. Se solicita además el registro de los numero de teléfono (787)-203-2449 y (939)- 274-1300 respecto a la triangulación de ambos teléfonos del mismo el día 6 de agosto de 2016, entre las 5:00 de la tarde a 12:30 de la media noche del 7 de agosto de 2016. Esta información es indispensable para continuar la investigación efectiva y el esclarecimiento de este doble asesinato.

Este Magistrado entiende que, de dicha declaración y del examen del declarante, existe causa probable para librar esta Orden Registro Celular y por lo tanto ordena que el Agte. Angel A. López Sanchez, de la División Homicidios de Ponce, registre el celular con el numero (787)- 203-2449 ante la compañia de teléfono celular CLARO, lo traiga inmediata y conjuntamente con la Orden diligenciada a mi presencia al Tribunal de Distrito de Ponce. Se autoriza a diligenciar esta Orden a cualquier hora del día y de la noche.

DADO BAJO MÍ FIRMA HOY ___5___ DE OCTUBRE DE 2016.

AFF. NUM. ___2009___

HORA: ___5:09 PM___

_____
Firma del Juez
Angel N. Candelario Tafz

Posteriormente, el 7 de febrero de 2017, el TPI-Ponce denegó la "*Moción Solicitando Supresión de Evidencia*". Luego, el 22 de febrero de 2017, comenzó el juicio por jurado con la desinsaculación del mismo. Se culminó la selección de los doce (12) miembros del jurado el 27 de abril de 2017. Ese mismo día, el apelante presentó una "*Moción In Limine*", mediante la cual reprodujo su petición de supresión de evidencia. En la misma, Rivera Marrero solicitó la celebración de una vista al amparo de la Regla 109 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 109, para dilucidar la admisibilidad de la prueba que se obtuvo por producto de la Orden de Registro emitida el 5 de octubre de 2016. En síntesis, en su escrito arguyó que la ocupación y el análisis del teléfono celular Samsung, modelo SM-G9201, fue ilegal. Por lo cual, la prueba que fue producto de dicho registro no debía ser admitida como prueba de cargo.

Aunque el Ministerio Público se opuso, el 12 de junio de 2017, el TPI-Ponce celebró una vista para atender los planteamientos relacionados a la "*Moción In Limine*". Escuchadas las partes, el Foro Primario declaró "*Con Lugar*" la solicitud de supresión de evidencia presentada por la defensa. El TPI-Ponce determinó que, tanto el celular ocupado del apelante, como la evidencia que fue producto de su análisis, eran inadmisibles por haber sido irrazonable el registro. El Foro Primario entendió que la orden en controversia no se extendía al equipo del celular con el número (787) 203-2449, por lo que al registrar el mismo sin una orden previa para ese propósito específicamente, luego de haber arrestado al apelante, el Estado incurrió en una intromisión indebida de su intimidad. En adición, explicó que la Orden de Registro se extendía únicamente al registro del proveedor de servicios del número de teléfono (787) 203-2449, y no a ocupar el celular.

Inconforme, el 13 de julio de 2017, el Procurador General acudió ante este Tribunal de Apelaciones mediante un recurso de *Certiorari*, en el caso número KLCE201701257. El 4 de agosto de 2017, este Foro Apelativo ordenó la paralización de los procedimientos, y luego, el 14 de noviembre de 2017, emitió una "*Resolución*", en la cual *revocó la determinación del TPI-Ponce* y ordenó la continuación de los procedimientos. En el dictamen, un Panel Hermano expresó que, "la totalidad de la evidencia proporcionó una base sustancial para la determinación de causa probable". Por lo cual, la Orden de Registro era totalmente válida. Añadió que, de la declaración jurada del agente que dio base a dicha orden, surgía meridianamente claro que se solicitó el registro del aparato físico.

Así, luego de varias *Conferencias con Antelación a Juicio*, el 5 de marzo de 2018, se reanudó el Juicio por Jurado. Posteriormente,

el 13 de marzo de 2018, comenzó a testificar el Agente López Sánchez.

- **Agente López Sánchez.**

El mismo declaró que, el 6 de agosto de 2016 aproximadamente a las 6:30 de la tarde, trabajaba en la División de Homicidios del CIC-Ponce.[3] Ese día, recibió una llamada de su supervisor que le ordenó verificar una querella recibida a través del sistema 911, con relación a un vehículo de motor encontrado con impactos de bala y sangre en la Carretera Núm. 153 en el Municipio de Santa Isabel.[4] Al llegar a la escena, a eso de las 6:58 de la tarde,[5] observó un vehículo Toyota Corolla verde, de cuatro (4) puertas, con la pintura desgastada y múltiples impactos de bala.[6] Testificó que en la escena se encontró al agente Alfredo Colón,[7] quien le indicó que verificara la residencia al final de la calle porque habían encontrado dos (2) cuerpos.[8] Al llegar a la residencia indicada, se encontró con la agente Yarimar Torres Martínez.[9] Igualmente, el agente López Sánchez indicó que observó los dos (2) cuerpos masculinos.[10] El testigo indicó que desde la entrada de la residencia pudo observar los dos (2) cuerpos con heridas de balas. Declaró que Wilson Medina le contó que vio, como entre las 5:40 p.m. y 5:45 p.m., dos (2) vehículos saliendo en dirección contraria a la escena donde ocurrieron los hechos, un Toyota Tercel verde con impactos en los cristales, y una *pickup* blanca, la cual era parecida a la del hombre que trabajaba en mantenimiento en dicha propiedad.

El agente López Sánchez declaró que posteriormente llegó Ashmin Irizarry Arroyo, quien realizó la búsqueda de evidencia

---

[3] Transcripción de la prueba oral, Parte II, pág. 232.
[4] *Id.*
[5] *Id.*, pag. 233.
[6] *Id.*, pág. 235.
[7] *Id.*, pág. 235.
[8] *Id.*, pág. 236.
[9] *Id.*, pág. 239.
[10] *Id.*, págs. 238-239.

alrededor de los cuerpos y luego del vehículo. Testificó que quien hizo la llamada al 911 fue José Torres Marrero, vecino del área y primo del abuelo del apelante. Como consecuencia de esta información, el agente comenzó la investigación contra Rivera Marrero.

El 7 de agosto de 2016, el agente López Sánchez testificó que entrevistó a Tenerith Negrón Cartagena, viuda del occiso Héctor Rivera Torres. Ella le dijo que el número de teléfono del esposo era el (939) 274-1300. Debido a que dicho celular no se encontró en la escena, el agente López Sánchez le solicitó a la Fiscal Limarí Cobián un *subpoena* para la compañía de teléfono Claro, con el propósito de verificar el registro de llamadas y mensajes desde el 1 de agosto de 2016 hasta el 6 de agosto de 2016, y llevar a cabo una triangulación. Entonces, el Ministerio Público le preguntó qué surgió del aludido registro, a lo que la defensa objetó bajo el fundamento de que dicho documento constituía prueba de referencia no admisible.

Luego de argumentar las partes la admisibilidad de esta parte del testimonio, el Foro Primario declaró "*Con Lugar*" la objeción de la defensa. Al continuar su testimonio, el Ministerio Público procedió a hacer una oferta de prueba al tribunal, indicando que, de permitirle al agente López Sánchez declarar sobre el hallazgo producto del registro hecho a la compañía de Claro, este explicaría, entre otras cosas, que el número de teléfono del apelante fue la última llamada que recibió uno de los occisos y que las torres de la compañía Claro ubicaban al referido número de teléfono en el área de los hechos. Por ello, solicitó que, bajo la Regla 107 de Evidencia, 32 LPRA Ap. VI, R. 107, se permitiera el testimonio del agente López Sánchez. Sin embargo, el 4 de abril de 2018, el Foro Primario declaró "*Con Lugar*" la objeción de la defensa.

Inconforme con la determinación del TPI-Ponce, el 6 de abril de 2018, el Procurador General acudió ante este Foro Apelativo, en el caso número KLCE201800559, impugnando la decisión del Foro Primario de no permitir que el agente López declarara sobre el contenido del registro de llamadas, sin que fuera admitido en evidencia. El 25 de abril de 2018 se ordenó la paralización de los procedimientos. Luego, mediante "*Resolución*" del 29 de junio de 2018, este Tribunal de Apelaciones determinó que el TPI-Ponce debía celebrar una vista, en ausencia del jurado, al amparo de la Regla 109 de Evidencia, 32 LPRA Ap. VI, R. 109. En la misma, el Ministerio Público tendría la oportunidad de presentar prueba para determinar si el aludido registro de llamadas cumplía con los requisitos de la Regla 805(f) de Evidencia, 32 LPRA Ap. VI, R. 805.

En consecuencia, el 6 de agosto de 2018 se celebró la referida vista. Luego, mediante "*Resolución*" emitida el 31 de agosto de 2018, el TPI-Ponce determinó que el registro de llamadas cumplía con los requisitos de admisibilidad dispuestos en la Regla 805 (f) de Evidencia, supra, como condición previa para que el agente López testificara frente a los miembros del Jurado. Sin embargo, resolvió que las identificaciones tituladas *Wireless Network Engineering* no cumplían con dichos requisitos, por lo que no podrían ser presentadas como excepción a la regla de prueba de referencia durante el testimonio del agente López. Igualmente, no se permitió el registro de llamadas relacionado al número de teléfono de uno de los occisos, ni de las antenas por no haber sido descubiertas por la defensa.

Entretanto, el 4 de septiembre de 2018, se reanudó el juicio por jurado ante el TPI-Ponce. No obstante, el Ministerio Público recurrió nuevamente a este Tribunal de Apelaciones mediante un recurso de *Certiorari,* en el caso número KLCE201801445. En su escrito, alegó que el TPI-Ponce erró al considerar que la prueba

suprimida no era admisible bajo la excepción a la prueba de referencia de récord de actividades que se realizan con regularidad en el curso normal de un negocio.

Mientras tanto, el juicio por jurado continuó, y, como resultado de lo declarado por el agente López, el 13 de septiembre de 2018 Rivera Marrero presentó una *"Moción de Supresión de Evidencia",* al amparo de la Regla 234 (f) de Procedimiento Criminal, 34 LPRA Ap. II, R. 234. Por lo cual, el 2 de octubre de 2018, el TPI-Ponce celebró una *Vista de Supresión de Evidencia.* En la misma, el Ministerio Público argumentó que el apelante no tenía expectativa de intimidad sobre la información que se obtuvo de las antenas de teléfono, pues la misma surgió del teléfono de la víctima. Además, planteó que la misma fue obtenida con una *Orden de Registro y Allanamiento,* y que posteriormente se obtuvo la orden para el registro del teléfono del apelante. Añadió que el registro fue legal, por lo cual la prueba no debía suprimirse. Igualmente, adujo que el asunto en controversia ya había sido resuelto en dicho procedimiento, por lo que la solicitud de supresión era tardía. Por otro lado, la defensa arguyó que, según *Carpenter v. US,* 138 US 296 (2018), las antenas no son parte de los récords de negocio como excepción a la prueba de referencia y que la información que surge de la triangulación de las mismas está protegida constitucionalmente. Además, indicó que, debido a la aludida decisión del Tribunal Supremo de Estados Unidos, su solicitud no era tardía. Escuchados los argumentos de las partes, el TPI-Ponce *denegó* la solicitud de supresión de evidencia presentada por el apelante.

El 15 de octubre de 2018, el Ministerio Público informó al Foro Primario que el Tribunal de Apelaciones había paralizado los procedimientos como consecuencia de un recurso de *Certiorari* y una *Moción en Auxilio de Jurisdicción.* Unos meses después, el 26 de

febrero de 2019, este Tribunal de Apelaciones emitió una "*Resolución*", en el caso núm. KLCE201801445, mediante la cual revocó la determinación del Foro Recurrido emitida el 31 de agosto de 2018. En el dictamen, se dispuso que las identificaciones tituladas *Wireless Network Engineering* de la prueba de cargo caían bajo las excepciones de récords de negocio contemplada en la Regla 805 (f), por lo que, contrario a lo resuelto por el TPI-Ponce, las mismas eran admisibles.

Asimismo, el 18 de marzo de 2019, el TPI-Ponce declaró "*No Ha Lugar*" a la "*Moción de Supresión de Evidencia*" que fue presentada por el apelante, el 13 de septiembre de 2018. El Foro Primario concluyó que, la declaración jurada que dio base a la expedición de la Orden de Registro y Allanamiento era válida, y que el apelante no logró demostrar lo contrario.[11]

Así las cosas, el 25 de junio de 2019, *luego de casi más de un (1) año después de su última comparecencia y múltiples incidentes procesales*, el Ministerio Público continuó interrogando al agente López Sánchez. Entre otras cosas, este declaró que, en el registro de llamadas, encontró seis (6) que fueron hechas hacia el número de teléfono (787) 203-2449, y dos (2) recibidas de este número el día de los hechos. Añadió que hubo otras cuatro (4) llamadas entre ambos números entre las 4:00 p.m. y 5:00 p.m. Igualmente, declaró que de la información provista por la compañía Claro pudo corroborar que ambos números de teléfonos se encontraban en el área de Lomas de Expreso, Carretera Núm. 153, en Santa Isabel.

Continuó testificando que, el 14 de septiembre de 2016, recibió una llamada anónima, que lo llevó a localizar a Thalia Rivera Santiago. Al encontrarla, el agente López Sánchez le indicó que

---

[11] El apelante recurrió mediante el recurso de *Certiorari* ante este Tribunal de Apelaciones, en el caso núm. KLCE201900513. No obstante, el Foro Apelativo denegó su expedición, e indicó que el TPI-Ponce no incurrió en prejuicio, parcialidad o error manifiesto en la apreciación de la prueba al denegar la supresión de evidencia.

acudiera al CIC de Aibonito con su madre, para ser entrevistada por él. De esta entrevista surgió que ella había sido pareja del apelante por aproximadamente dos (2) meses. Además, en respuesta a sus preguntas, la testigo le contó al agente que había recibido, mientras se encontraba trabajando, a su celular una foto que reflejó a un hombre tirado en el piso sangrando.[12] La foto incluyó un mensaje que decía "me las vas a pagar, ahí te dejamos un regalito".[13] Le explicó que, al recibirla, comenzó a gritar pensando que era el cuerpo del apelante.[14] No obstante, al preguntarle si podía ver la imagen que recibió, la testigo indicó que la había borrado. El agente López Sánchez mencionó que notó a la testigo mirando mucho a su madre, por lo que la citó nuevamente para otra entrevista. Previo a culminar la entrevista, el agente le entregó un formulario de consentimiento para un registro de su teléfono, con el número (939) 250-6846, el cual fue firmado por la testigo y el agente.

Así, entonces, el agente López Sánchez continuó declarando que, el 26 de septiembre de 2016, entrevistó nuevamente a Thalia Rivera Santiago, quien le contó que el apelante le confesó el 6 de agosto de 2016, mediante una llamada, que él mató a los occisos porque de lo contrario, lo matarían a él.[15] Le indicó al agente López Sánchez que a las 12:00 a.m., el 7 de agosto de 2016, el apelante la buscó en una *pickup* Mazda blanca, y le contó que había matado a dos hermanos que le debían dinero.[16] La testigo le explicó que el apelante pensó que los occisos lo habían citado para matarlo, y no para pagarle el dinero que le debían.[17] Por ello, según la testigo le explicó al agente López Sánchez, el apelante citó a los occisos a la residencia en Santa Isabel, los esperó escondido en el garaje, y,

---

[12] Transcripción de la prueba oral, Parte II, pág. 682.
[13] *Id.*, pág. 682.
[14] *Id.*, pág. 682.
[15] *Id.*, pág. 689.
[16] *Id.*, pág. 690.
[17] *Id.*

cuando estos llegaron en el Toyota Tercel, les disparó.[18] Este se retiró para recargar el arma, y al regresar, los remató en el suelo.[19] Thalia Rivera Santiago le contó que el apelante iba acompañado por otra persona, quien movió el vehículo Toyota Tercel verde y lo ubicó más adelante en la misma Carretera.[20] El agente López Sánchez indicó que luego de contarle lo anterior, la testigo escribió lo narrado a puño y letra.[21] Una vez culminó, el agente López Sánchez declaró que le preguntó nuevamente a la testigo sobre las fotos que había recibido en su celular. No obstante, en esta ocasión le indicó al agente que aún tenía las fotos y que no las había borrado.[22] El agente López Sánchez testificó que, cuando se le mostraron, examinó las imágenes.[23]

Entonces, el Ministerio Público marcó como identificaciones una *Solicitud de Informe del Negociado de Ciencias Forenses*, en adelante NCF, un *Certificado de Análisis Forense del NCF*, y un *DVD* con la evidencia digital examinada por el NCF, para ilustrar al Jurado del contenido de las fotos y mensajes de texto que había recibido la testigo.[24] No obstante, la defensa objetó su admisibilidad por tratarse de prueba de referencia. Luego de escuchar la posición de las partes, el Foro Primario decretó "*Con Lugar*" la objeción, e indicó que la misma podría ser traída con otro testigo, mas no con el agente López Sánchez.

El Ministerio Público recurrió nuevamente ante este Tribunal de Apelaciones, el 1 de agosto de 2019, mediante un recurso de *Certiorari*, en el caso número KLCE201901050. El 5 de agosto de 2019 el Foro Apelativo paralizó los procedimientos. No obstante, el

---

[18] Transcripción de la prueba oral, Parte II, pág. 690.
[19] *Id.*
[20] *Id.*
[21] *Id.*, pág. 691.
[22] *Id.*, pág. 700.
[23] *Id.*, pág. 700.
[24] *Id.*, págs. 701-708.

22 de agosto de 2019, el Tribunal de Apelaciones *denegó* la expedición del recurso.

Posteriormente, el agente López Sánchez continuó testificando y relató que, el 30 de septiembre de 2016, Thalia Rivera Santiago compareció a Fiscalía, en donde se le solicitó un segundo consentimiento para investigar su celular, pero esta vez para realizar una búsqueda más amplia, lo cual la misma firmó.[25] A continuación, incluimos el referido consentimiento:[26]

Igualmente, la testigo entregó su celular a la división de evidencia digital del ICF, y firmó el "*Consentimiento para análisis de teléfono*

---

[25] Transcripción de la prueba oral, Parte II, pág. 722.
[26] Exhibit Núm. 20 del Ministerio Público. Para propósitos de confidencialidad, hemos tachado el número de identificación de la testigo.

*celular*".[27] Además, se le tomó una declaración jurada.[28] Asimismo, el agente López Sánchez declaró que el 5 de octubre de 2016 solicitó la Orden de Registro para el teléfono (787) 203-2449.

Luego, el agente López Sánchez declaró que, el 7 de octubre de 2016, arrestó al apelante en su hogar, ocupando también una *pickup* Mazda blanca en la residencia.[29] Luego de trasladarlo a la Comandancia de Aibonito, le leyó las advertencias *Miranda* y procedió a entrevistarlo con su consentimiento. Según el agente López Sánchez, el apelante le informó que trabajaba en una barbería y en mantenimiento de patios, y que Héctor Rivera Torres le vendía marihuana. El apelante le informó que había hecho mantenimiento en la residencia del Municipio de Santa Isabel, donde ocurrieron los hechos. Igualmente, el apelante le confirmó que conducía un vehículo *pickup* Mazda blanco y que su número de teléfono era el (787) 203-2449.

Así las cosas, luego de varias *Conferencias con Antelación al Juicio*, vistas evidenciarias e incidentes procesales, el 28 de abril de 2021 se reanudó nuevamente el juicio por jurado con el desfile de los testigos. Entre los testigos que presentó el Ministerio Público, se encontraba Thalia Rivera Santiago, quien terminó de declarar el 4 de junio de 2021. Luego, el 21 de octubre de 2021, Rivera Marrero presentó un "*Moción de Desestimación*" por alegadamente haber una prueba potencialmente exculpatoria que no fue descubierta.[30] El apelante alegó que del testimonio de Thalia Rivera Santiago surgió que el Estado había destruido una prueba potencialmente exculpatoria. No obstante, el TPI-Ponce declaró la misma *"No Ha Lugar"*.[31]

---

[27] Exhibit 21 del Ministerio Público.
[28] Transcripción de la prueba oral, Parte II, pág. 717.
[29] Transcripción de la prueba oral, Parte II, pág. 727.
[30] *Id.*, págs. 2596-2597.
[31] *Id.*, pág. 2618.

El juicio continuó hasta el 3 de noviembre de 2021, en el cual el Jurado emitió su veredicto conforme a derecho. El mismo encontró culpable a Rivera Marrero por todos los cargos en su contra. De igual forma, el Jurado autorizó la imposición de los agravantes. Así, el 18 de enero de 2022, el TPI-Ponce dictó sentencia contra el apelante, y le impuso una pena de noventa y nueve (99) años de reclusión en el Caso Número JVI2016G0036, una pena agregada de diecinueve (19) años, nueve (9) meses y dieciocho (18) días de reclusión en el Caso Número JVI2016G0037. En adición, en el Caso Número JLA2016G0191, al amparo del Artículo 5.04 de la Ley de Armas, supra, el Foro Primario le impuso un total de treinta (30) años de reclusión a ser cumplidos de manera consecutiva. En total, la pena impuesta al apelante es de ciento cuarenta y ocho **(148) años, nueve (9) meses y dieciocho (18) días de reclusión**, abonándose el tiempo cumplido en detención preventiva.

A continuación, ofrecemos un resumen de los restantes veinticinco (25) testimonios vertidos en el juicio que nos ocupa, y que hemos examinado con detenimiento, con excepción del testimonio del agente López Sánchez, el cual fue discutido previamente en este escrito.

- **Tenerith Negrón Cartagena**[32]

La testigo declaró que, el 6 de agosto de 2016 a las 5:30 a.m., vio por última vez a su esposo, Héctor Rivera Torres. Al día siguiente, a través de un medio noticiero local, vio un reportaje sobre un doble asesinato, en la cual reconoció en las imágenes el carro de su esposo, por lo que se comunicó con varios cuarteles para obtener información. Alrededor de las 7:30 de la mañana, llamó a Héctor Rivera Muñiz, padre de los occisos, y le informó de la muerte de su esposo y su hermano, Roberto Rivera Torres. Posteriormente, como

---

[32] Transcripción de la prueba oral, Parte I, págs. 6-40.

a las 9:00 de la mañana, la testigo, junto a Héctor Rivera Muñiz, acudió a la Comandancia de Ponce, en donde fue entrevistada. Al día siguiente, el 8 de agosto de 2016, la testigo acudió ante el Instituto de Ciencias Forenses, en adelante ICF, para identificar a los cuerpos de los occisos.

- **Héctor Rivera Muñiz[33]**

El testigo declaró que, el 6 de agosto de 2016, en el periodo de 10:30 de la mañana y 1:00 de la tarde, tuvo comunicación con sus hijos Héctor Rivera Torres y Roberto Rivera Torres. Indicó que estos andaban en el vehículo de Héctor Rivera Torres, un Toyota verde. Como a las 6:00 de la tarde, el testigo les envió un mensaje a sus hijos. pero no recibió respuesta. El 7 de agosto de 2016 recibió una llamada de Tenerith Negrón Cartagena, quien le informó que habían matado a sus dos hijos. Al día siguiente, el testigo acudió al ICF para identificar los cuerpos de los occisos.

- **Agente Yalimar Torres Martínez[34]**

La testigo declaró que, el 6 de agosto de 2016, se encontraba laborando como patrullera de la Policía de Puerto Rico, junto al agente Alfredo Colón. Testificó que estos recibieron una llamada de un retén, aproximadamente entre las 5:55 p.m. y 6:00 p.m., informándoles de unas detonaciones escuchadas en la Loma del Expreso en Santa Isabel. Al llegar a la Carretera Núm. 153, junto al agente Alfredo Colón y el sargento Estali Orengo Caraballo, vieron un vehículo Toyota Tercel verde, cuyo baúl estaba abierto y aparentaba tener múltiples impactos de bala. La agente declaró que se mantuvo custodiando el referido vehículo con el agente Alfredo Colón. Unos minutos después, el sargento Orengo Caraballo le informó al agente Alfredo Colón que encontró una escena en una residencia al final de un camino sin salida. Por lo que, la testigo lo

---

[33] Transcripción de la prueba oral, Parte I, págs. 46-51.
[34] *Id.*, págs. 51-119.

acompañó a la misma, en donde encontraron dos (2) cuerpos masculinos en el garaje. En la escena, observó varios casquillos de bala. Por estos hechos, los agentes pusieron una cinta amarilla alrededor de la escena y llamaron a las unidades de la Policía de Puerto Rico. La testigo indicó que, al salir de la residencia, entrevistó a Wilson Medina. Este le informó que escuchó las detonaciones y que vio pasar a un Toyota y una guagua *Pickup* Mazda blanca, que iba conducida por la persona que limpiaba dicha residencia. Wilson Medina también le informó que llamó a su hermano, Roberto Medina Gueits, un expolicía.

- **Sargento Estali Orengo Caraballo**[35]

El sargento testificó, que el 6 de agosto de 2016 como a las 6:00 de la tarde, recibió la llamada del retén informándole sobre unas detonaciones en el área de la Loma del Expreso en Santa Isabel. El sargento le informó de la llamada a la agente Yalimar Torres Martínez y al agente Alfredo Colón. El sargento testificó que llegó a la escena aproximadamente a las 6:15 de la tarde, junto al agente Pomales. Allí, encontraron un vehículo con la puerta del conductor y el baúl abierto, y con varios impactos de bala. Indicó que no había personas en dicho vehículo. Asimismo, declaró que, al hacer su recorrido, se encontró a Wilson Medina, quien le informó que escuchó detonaciones que provenían del final de la calle. El sargento, al llegar al área indicada, observó una residencia que tenía el portón abierto que los conducía hasta un garaje. Antes de entrar, se encontró con Roberto Medina Gueits, un expolicía y hermano de Wilson Medina. Testificó que, al Roberto acercarse al portón, le indicó que habían dos (2) cuerpos. El sargento testificó que los cuerpos estaban boca abajo y ensangrentados, con casquillos alrededor. En ese entonces, Roberto Medina Gueits le indicó que su

---

[35] Transcripción de la prueba oral, Parte I, págs. 124-175.

hermano Wilson Medina le contó lo que escuchó y por eso procedió a llamar a la Policía para informar sobre lo sucedido.

- **Andrés Rivera Matos[36]**

El testigo indicó que fue el tele comunicador del 911 que atendió la llamada de José Torres el 6 de agosto de 2016, quien le informó haber visto un Toyota verde con impactos de bala en la Carretera. El testigo le pasó la información a la Comandancia de la Policía.

- **Elmer Torres Rosario[37]**

El testigo declaró que laboraba como técnico de grabación del sistema de 911, encargado de gestionar las *subpoenas* que llegan al 911. Testificó que el 6 de agosto de 2016 certificó la grabación de la llamada que fue hecha con relación a los hechos que nos ocupan. Añadió que, el 11 de agosto de 2016, la grabación fue solicitada por el agente Ángel López Sánchez.

- **Evelyn Medina Conde[38]**

La testigo declaró que trabajaba en la Junta de Gobierno del 911. La misma certificó que lo escrito en el *Print Out* de la llamada del 6 de agosto de 2016, era igual a lo que surgía en la grabación de dicha llamada.

- **Roberto Medina Gueits[39]**

El testigo declaró que, el 6 de agosto de 2016, aproximadamente entre las 5:30 p.m. y las 6:00 p.m., recibió una llamada de su hermano Wilson Medina. En la misma, su hermano le informó de unas detonaciones que escuchó cerca de su casa. Por lo que le recomendó a su hermano que no saliera de su casa, y que él personalmente se encargaría de llamar a la Policía. El testigo se dirigió a la escena, en la cual se encontraba una patrulla. El mismo

---

[36] Transcripción de la prueba oral, Parte I, págs. 176-213.
[37] *Id.*, págs. 213-241.
[38] *Id.*, págs. 242-304.
[39] *Id.*, págs. 313-323.

acompañó a los agentes allí presentes hasta el final de la calle, donde encontraron dos (2) cuerpos de varones en un garaje.

- **Marilyn García Santiago[40]**

La testigo declaró que, para el 6 de agosto de 2016, esta era investigadora forense. Ese día, acudió a la escena, junto a Ashmin Irizarry Arroyo, para tomar fotos y videos de la residencia en Santa Isabel, en la cual encontraron a los dos (2) occisos y al vehículo Toyota Tercel verde.

- **Wilson Medina[41]**

El testigo declaró que el 6 de agosto de 2016, aproximadamente entre las 5:35 p.m. y las 5:40 p.m., en la Loma del Expreso en Santa Isabel, escuchó unas detonaciones que aparentaban originarse al final de la calle sin salida. Poco después, vio pasar dos vehículos. Testificó que llamó a su hermano Roberto Medina Gueits, un expolicía. Este llegó hasta su casa y luego acompañó a una patrulla hasta el final de la calle. Indicó que, cuando su hermano Roberto le contó lo que vio con los agentes, acudió al área y observó los dos (2) cuerpos varones que habían descubierto en la residencia la final de la calle.

- **Omar Ortiz Reyes[42]**

El testigo declaró que, para la fecha de los hechos, trabajaba como técnico y custodio de evidencia del ICF, pero que actualmente pertenecía al ejército de Estados Unidos. Testificó que, el 15 de agosto de 2016, recibió una evidencia de balística y ADN del investigador forense Ashmin Irizarry Arroyo. Informó que, según de la información provista, la misma correspondía a los hechos que ocurrieron el 6 de agosto de 2016 en Santa Isabel.

---

[40] Transcripción de la prueba oral, Parte I, págs. 313-664. Transcripción de la prueba oral, Parte II, págs. 8-154.
[41] Transcripción de la prueba oral, Parte II, págs.
[42] *Id.*, págs. 155-229.

- **Ashmin Irizarry Arroyo[43]**

El testigo declaró que, para el 6 de agosto de 2016, trabajaba como investigador forense de escenas criminales en el ICF. Testificó que, ese día, junto a Marilin García Santiago, acudió a la escena. En la misma, observó que en una residencia habían dos (2) cuerpos en un garaje y evidencia relacionada a un arma de fuego alrededor de los occisos. Relató que, el vehículo Toyota Tercel verde tenía perforaciones de aparentes impactos de bala en el cristal delantero, la *capota* y en el cristal de la puerta trasera del lado derecho. De igual forma, notó que el vehículo tenía manchas de sangre.

- **Thalia Rivera Santiago[44]**

La testigo declaró que el apelante había trabajado en mantenimiento en la residencia donde ocurrieron los hechos. Testificó que, el 6 de agosto de 2016, al salir de su trabajo recibió una llamada del apelante, quien en ese momento era su pareja. Relató que, en la misma, el apelante le confesó que había matado a dos (2) personas porque si no estos lo iban a matar a él. Rivera Marrero la fue a buscar en una *pickup* Mazda blanca, y que le contó lo sucedido. Según declaró la testigo, el apelante le contó que esperó en el garaje de la residencia a los occisos, pensando que, por estos deberle dinero, le habían puesto una trampa para matarlo a él. Al llegar, el apelante les disparó. Luego, los occisos salieron del vehículo, se tiraron al suelo, y el apelante los remató. Rivera Marrero le contó que, el amigo que lo acompañaba se encargó de mover el vehículo de los occisos más adelante en la Carretera. Rivera Santiago declaró que el apelante le pidió por mensaje de texto, lo cuales reconoció en Sala, que no dijera nada de lo que le contó y que

---

[43] Transcripción de la prueba oral, Parte II, págs. 451-631.
[44] *Id.*, págs. 1114-1358.

borrara unas fotos que tenía en *Facebook* porque aparecían en la residencia en que ocurrieron los hechos.

Continuó testificando que, el 2 de septiembre de 2016, recibió una foto por *WhatsApp* de un número desconocido. La misma mostraba a dos (2) cuerpos ensangrentados boca abajo en el piso. Igualmente, la testigo declaró sobre las entrevistas que tuvo con el agente López Sánchez sobre el caso y de los consentimientos que brindó para que su teléfono celular fuera analizado.

En el contrainterrogatorio, a preguntas de la defensa, la testigo declaró que, al escribir su versión a puño y letra, el agente López Sánchez rompió en tres (3) ocasiones el documento que escribió. Testificó que, a pesar de que la última versión que escribió era distinta a la primera, el agente López Sánchez no le ordenó escribir que fue el apelante quien cometió los hechos.

- **Ana Torres Colón**[45]

La testigo declaró que era técnica de control y custodia en el ICF, y que estaba encargada de recibir, manejar, y custodiar la evidencia hasta su disposición. Testificó que, el 7 de octubre de 2016, recibió del agente Ángel López Sánchez un teléfono celular marca *Iphone*. La testigo embaló el mismo y lo entregó a Julia Hernández Arroyo para que analizara la evidencia digital. Asimismo, la testigo informó que recibió proyectiles, casquillos, balas sin disparar y un aplicador de algodón para análisis serológico.

- **Félix Vázquez Solís**[46]

El testigo declaró que trabajaba como técnico de control y custodia en el ICF. Este declaró que estuvo encargado de sacar de la bóveda unos proyectiles, casquillos, balas, y un material recuperado del vehículo Toyota Tercel para ser entregado a los respectivos peritos encargados de su análisis. Igualmente, informó

---

[45] Transcripción de la prueba oral, Parte II, págs. 1759-1820.
[46] *Id.*, págs. 1758-1846.

que recibió y guardó en la bóveda un teléfono celular marca Samsung que le entregó el agente Ángel López Sánchez.

- **Julia Hernández Arroyo[47]**

La testigo declaró que era la directora del laboratorio de criminalística del ICF. Testificó que, el 14 de octubre de 2016, recibió un teléfono celular marca *Samsung,* con el número (787) 203-2449, para ser analizado. Del análisis surgió que el mismo pertenecía al apelante. Igualmente, declaró que, de una conversación entre dicho número y el 939-268-9445 en WhatsApp, se envió una foto de los occisos encontrados en la escena.

- **José Rivera Navarro[48]**

El testigo declaró que trabajaba como coordinador de servicios de seguridad en la compañía de Claro, y era el encargado de contestar los requerimientos de las agencias de ley y orden. Testificó que recibió una Orden de Registro y Allanamiento para el teléfono celular 787-203-2449, particularmente del registro de llamadas del 1 de agosto de 2016 hasta el 3 de septiembre de 2016. Del mismo modo, se le solicitó el registro de llamadas del número 939-274-1300, al igual que la triangulación entre ambos números entre las 5:00 p.m. del 6 de agosto de 2016 y las 12:30 a.m. del 7 de agosto de 2016. Relató que, desde el 5 de agosto de 2016, hubo múltiples llamadas entre ambos números. Particularmente, el 6 de agosto de 2016 a las 5:44 p.m., la triangulación ubicó al 787-203-2449 en Santa Isabel y al 939-274-1300 en Coamo. Luego, ubicó al primero en Coamo y al segundo en Salinas.

- **Murphy Rivera Alicea[49]**

El testigo declaró que trabajaba en control y custodia del ICF, y que estuvo encargado de recibir el celular *Samsung* luego de ser

---

[47] Transcripción de la prueba oral, Parte II, págs. 1849-2090.
[48] *Id.*, págs. 2093-2252.
[49] *Id.*, págs. 2258-2266.

analizado por Julia Hernández Arroyo, y posteriormente entregárselo al agente Ángel López Sánchez.

- **María Hernández Miranda[50]**

La testigo declaró que trabajaba como técnica de control y custodia de evidencia en el ICF, y que estuvo a cargo de entregarle el celular Samsung a Julia Hernández Arroyo cuando lo solicitó el 14 de octubre de 2018. Igualmente, le entregó a Windaliz Torres Santiago unas muestras biológicas para hacerle la serología.

- **Anthony Matías Rodríguez[51]**

El testigo declaró que trabajaba en la sección de química forense en el ICF. Testificó que, el 17 de octubre de 2016, solicitó el material particulado que se recogió del Toyota Tercel verde. Tras analizarlo, concluyó que el mismo era pólvora.

- **Dr. Carlos Chávez Arias[52]**

El testigo declaró que fue el *patólogo forense* encargado de realizar la autopsia de los occisos, y que concluyó que la causa de muerte fueron las heridas de bala provocadas por otra persona.

- **Windaliz Torres Santiago[53]**

La testigo declaró que trabajaba en serología forense en el ICF. Esta testificó que, del análisis serológico de los aplicadores recogidos en el Toyota Tercel y de una bala, concluyó que el material que se levantó de la puerta derecha de dicho vehículo correspondía a Héctor Rivera Torres.

- **Mireya Hernández Arroyo[54]**

La testigo declaró que trabajaba en el ICF como especialista forense en ADN, y que fue la encargada de entregarle a María Hernández Miranda unos aplicadores.

---

[50] Transcripción de la prueba oral, Parte II, págs. 2266-2288.
[51] *Id.*, págs. 2293-2318.
[52] *Id.*, págs. 2328-2392.
[53] *Id.*, págs. 2404-2456.
[54] *Id.*, págs. 2456-2463.

- **Andreina Nazario Avilés[55]**

La testigo declaró que para el año 2016 trabajaba en el ICF como examinadora de armas de fuego. Testificó que analizó tres (3) proyectiles de bala y sus derivados, que fueron obtenidos del Toyota Tercel verde, siete (7) proyectiles, veintitrés (23) casquillos de bala disparados y dos (2) balas sin disparar, recuperados de la residencia. La testigo concluyó que la prueba analizada provenía de una misma arma de fuego.

- **Agente Miguel Quiñones Carrasquillo (testigo de la defensa)[56]**

El agente declaró que trabajaba como técnico de huellas dactilares para la Policía de Puerto Rico, y que, al analizar el Toyota Tercel verde, encontró huellas que correspondían a Héctor Rivera Torres.

Con los testimonios antes reseñados, la prueba documental y demostrativa y el veredicto de culpabilidad rendido por los miembros del Jurado, el TPI-Ponce dictó la *"Sentencia"* antes indicada.

Inconforme con la Sentencia en su contra, el 15 de febrero de 2022, el apelante presentó su *"Escrito de Apelación"* ante nos. Luego de varios incidentes procesales, recibimos los autos originales el 27 de febrero de 2025. Por ello, el 15 de abril de 2025, el Rivera Marrero presentó su *"Alegato del Apelante"*. En su escrito, el apelante señala los siguientes errores:

> **PRIMER ERROR:** ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL ENCONTRAR CULPABLE AL SEÑOR CASTILLO DEL ROSARIO *[sic]* AUN CUANDO NO SE PROBÓ SU CULPABILIDAD MÁS ALLÁ DE DUDA RAZONABLE.
> **SEGUNDO ERROR:** ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL NO DESESTIMAR LOS CARGOS PRESENTADOS CONTRA EL SEÑOR RIVERA MARRERO AUN CUANDO EL ESTADO DESTRUYÓ DE FORMA INTENCIONAL EVIDENCIA POTENCIALMENTE EXCULPATORIA.

---

[55] Transcripción de la prueba oral, Parte II, págs. 2466-2541.
[56] *Id.*, págs. 2570-2583.

**TERCER ERROR:** ERRÓ EL HONORABLE TRIBUNAL DE PRIMERA INSTANCIA AL ADMITIR EN EVIDENCIA INFORMACIÓN OBTENIDA DEL TELÉFONO DEL APELANTE AUN CUANDO LA ORDEN JUDICIAL PARA EL REGISTRO FUE EXPEDIDA EN CONTRAVENCIÓN DE LA LEY.

Así las cosas, el 22 de mayo de 2025, el Procurador General de Puerto Rico, en representación del Ministerio Público, en adelante Procurador General, presentó su "*Alegato de el Pueblo de Puerto Rico*".

Examinados los autos originales que obran ante nos, la transcripción de los procedimientos y los alegatos de las partes, nos encontramos en posición de resolver.

## II.

### A. Apelación Criminal

En nuestro ordenamiento jurídico, toda persona acusada tiene derecho a apelar cualquier sentencia penal que recaiga en su contra. *Pueblo v. Torres Medina*, 211 DPR 950, 959 (2023). Es importante señalar que la apelación es un privilegio estatutario que adquirió un carácter cuasi-constitucional que forma parte del debido proceso de ley. *Pueblo v. Rivera Ortiz*, 209 DPR 402, 419 (2022); *Pueblo v. Esquilín Díaz*, 146 DPR 808, 815-816 (1998); *Pueblo v. Prieto Maysonet*, 103 DPR 102, 104 (1974). Este Tribunal de Apelaciones, una vez adquirida la jurisdicción de la controversia, tiene el deber de resolver el recurso de apelación en sus méritos. *Pueblo v. Colón Canales*, 152 DPR 284, 291 (2000). Por ello, los tribunales apelativos poseemos la facultad de examinar cualquier error de derecho cometido por los tribunales de primera instancia, así como cualquier asunto de hecho y derecho. *Pueblo v. Rivera Ortiz*, supra, págs. 421-422; *Pueblo v. Irizarry*, 156 DPR 780, 788 (2002). Pues, como cuestión de derecho, la determinación de probar la culpabilidad de una persona más allá de duda razonable es revisable, dado que la apreciación de la prueba es un asunto tanto de hecho como de derecho. *Pueblo v. Torres Medina*, supra; *Pueblo*

*v. Irizarry*, supra; *Pueblo v. Rivero Lugo y Almodóvar*, 121 DPR 454, 473 (1988); *Pueblo v. Pagán Díaz,* 111 DPR 608, 621 (1981).

Es norma hartamente conocida que el juzgador de los hechos está en mejor posición para apreciar y aquilatar la prueba presentada. *Pueblo v. Casillas, Torres,* 190 DPR 398, 416 (2014). A esos efectos, la apreciación de la prueba del juzgador de los hechos merece gran respeto y deferencia por parte de un foro apelativo. *Id.* Así las cosas, los tribunales apelativos solamente intervendremos con la apreciación de la prueba cuando se demuestre existencia de *pasión, prejuicio, parcialidad o error manifiesto. Pueblo v. Casillas, Torres,* pág. 417; *Pueblo v. Rivera Ortiz*, supra, pág. 422; *Pueblo v. Irizarry*, supra, págs. 788-789.

Además, intervendremos cuando surjan serias dudas, razonables y fundadas sobre la culpabilidad de la persona acusada. *Pueblo v. Casillas, Torres*, supra; *Pueblo v. Irizarry, supra,* pág. 789. Sin embargo, "si de un análisis ponderado de la prueba desfilada ante el foro primario surge duda razonable y fundada sobre si la culpabilidad del acusado fue establecida más allá de duda razonable, este Tribunal tiene el deber de dejar sin efecto el fallo o veredicto condenatorio". *Pueblo v. Casillas, Torres*, supra.

Cuando un acusado presenta un recurso de apelación en el que plantea como error insuficiencia de la prueba, así como errores de derecho, los foros apelativos realizaremos un escrutinio de dos (2) partes. *Pueblo v. Ortiz Colón,* 207 DPR 100, 125 (2021). En primer lugar, evaluaremos la alegación de insuficiencia de prueba que, de ser meritoria, procede absolver al acusado. *Id.* Ahora bien, si el reclamo de insuficiencia de la prueba resulta inmeritorio, procede atender los errores de derecho. *Id.*

**B. Duda Razonable**

Nuestra Carta Magna, en su Artículo II, Sección 11, establece que los imputados o acusados de delito disfrutan de una presunción de inocencia. *Pueblo v. Negrón Ramírez*, 213 DPR 895, 907 (2024). Por eso, la Regla 110 de Procedimiento Criminal, 34 LPRA Ap. II, R. 110, dispone que esta presunción deberá ser rebatida, probando lo contrario. El estándar probatorio para que el Estado logre establecer la culpabilidad de un imputado o acusado de delito es la "duda razonable". *Pueblo v. García Colón I*, 182 DPR 129, 174 (2011); *Pueblo v. Ramos Álvarez*, 122 DPR 287, 315-316 (1988). Es decir, se deberá probar su culpabilidad más allá de toda duda razonable. Lo anterior, constituye uno de los imperativos más básicos y esenciales del debido proceso de ley. *Pueblo v. Irizarry*, supra, pág. 786. Cabe recalcar que este es el más riguroso estándar probatorio.

La duda razonable que justifica la absolución del acusado es "el resultado de la consideración serena, justa e imparcial de la totalidad de la evidencia del caso o de la falta de suficiente prueba en apoyo de la acusación." *Pueblo v. Irizarry*, supra, pág. 788. Es decir, la duda razonable no es otra cosa que "la insatisfacción de la conciencia del juzgador con la prueba presentada". *Id.*

Ahora bien, nuestro ordenamiento jurídico establece que un hecho puede establecerse mediante evidencia directa o circunstancial. Regla 110 de Evidencia, 32 LPRA Ap. VI, R. 110. La precitada Regla dispone, además, que la prueba directa es aquella "que prueba el hecho en controversia sin que medie inferencia o presunción alguna y que, de ser cierta, demuestra el hecho de modo concluyente". Por otro lado, la misma Regla establece que la circunstancial "tiende a demostrar el hecho en controversia probando otro distinto, del cual por si o, en unión a otros hechos ya establecidos, puede razonablemente inferirse el hecho en controversia".

Con relación a la prueba testifical, tanto la precitada Regla, como nuestra jurisprudencia, ha sido clara en que aquel testimonio al que el juzgador le merezca entero crédito será suficiente para probar un hecho. *Id. Pueblo v. Chévere Heredia*, 130 DPR 1, 19-21 (1995). Es por esta deferencia a la credibilidad que otorgue el juzgador de los hechos a un testigo, que aun si se encontrara falsedad en parte sus declaraciones, no será necesario descartar el resto de su testimonio. *Pueblo v. Rodríguez Pagán*, 182 DPR 239, 260 (2011); *Pueblo v. Pagán Ortiz*, 130 DPR 470, 483 (1992).

Por otra parte, es norma reiterada que la apreciación que hace un juzgador de los hechos y de la prueba que desfila en el juicio es una cuestión mixta de hecho y de derecho. *Pueblo v. González Román*, 138 DPR 691, 708 (1995); *Pueblo en interés del menor F.S.C.*, 128 DPR 931, 942 (1991). Por esto, la misma es revisable en apelación. *Id.* Por otro lado, tal apreciación incide sobre la suficiencia de la prueba, capaz de derrotar la presunción de inocencia, lo que puede convertir este asunto en uno de derecho.

Nuestro Tribunal Supremo ha enfatizado, en ocasiones repetidas, que la valoración y el peso que el juzgador de los hechos le imparte a la prueba y a los testimonios presentados ante sí *merecen respeto y confiabilidad* por parte de este Tribunal. *Pueblo v. Maisonave Rodríguez*, 129 DPR 49, 62-63 (1991); *Pueblo v. Carrasquillo Carrasquillo*, 102 DPR 545, 551 (1974). Como corolario de lo anterior, *salvo que se demuestre la presencia de error manifiesto, pasión, prejuicio o parcialidad*, el foro apelativo no debe intervenir con la evaluación de la prueba hecha por el juzgador de hechos. *Pueblo v. Acevedo Estrada*, 150 DPR 84, 98-99 (2000); *Pueblo v. Rodríguez Román*, 128 DPR 121, 128 (1991).

No obstante, el foro apelativo podrá intervenir con tal apreciación cuando de una evaluación minuciosa surjan "serias

dudas, razonables y fundadas, sobre la culpabilidad del acusado". *Pueblo v. Carrasquillo Carrasquillo, supra*, pág. 551. Ante la inconformidad que crea la duda razonable, los tribunales apelativos, aunque no están en la misma posición de apreciar la credibilidad de los testigos, sí tienen, al igual que el Foro Apelado, "no sólo el derecho [,] sino el deber de tener la conciencia tranquila y libre de preocupación". *Pueblo v. Irizarry*, supra, pág. 790; *Pueblo v. Carrasquillo Carrasquillo*, supra, pág. 552.

Por ende, el Foro Primario está en mejor posición para aquilatar la prueba testifical que ante sí se presenta, ya que es quien tiene ante sí a los testigos cuando declaran. *Barreto Nieves et al v. East Coast,* 213 DPR 852, 889 (2024); *Pueblo v. Negrón Ramírez*, supra, pág. 910; *Pueblo v. González Rivera*, 207 DPR 846, 848 (2021); *E.L.A. v. P.M.C.,* 163 DPR 478, 490 (2004); *Argüello v. Argüello,* 155 DPR 62, 79 (2001). El juzgador de los hechos es quien goza del privilegio al poder apreciar el comportamiento del testigo, o el 'demeanor', lo que le permite determinar si le merece credibilidad o no. Este es quien tiene la oportunidad de verlos y observar su manera de declarar, apreciar sus gestos, titubeos, contradicciones, manerismos, dudas y vacilaciones. *Pueblo v. Cruz Rosario*, 204 DPR 1040, 1057-1058 (2020); *Pueblo v. Toro Martínez*, 200 DPR 834-857-858 (2018); *Pueblo v. García Colón I,* supra, pág. 165; *Pueblo v. Viruet Camacho*, 173 DPR 563, 584-585 (2008). Resulta importante destacar que "el testimonio de un testigo principal, por sí solo, de ser creído, es suficiente en derecho para sostener un fallo condenatorio". *Pueblo v. Toro Martínez*, supra, pág. 860.

Por último, luego que recae un veredicto de culpabilidad, permea una presunción de corrección sobre el dictamen.

### C. Deferencia al Jurado

El trato marcado por deferencia hacia las determinaciones de los jurados se remonta al Siglo XVIII, cuando el derecho a juicio por jurado del "common law" inglés, fue ratificado mediante la aprobación de la Sexta Enmienda de la Constitución de los Estados Unidos de América. *Peña-Rodríguez v. Colorado*, 580 US 206, 231 (2017).

Las decisiones que toma *un jurado* son protegidas por el conocido "no impeachment rule", el cual fue aplicado por primera vez en el caso inglés del año 1785, *Vaise v. Delaval,* 1 T.R. 11, 99 Eng. Rep. 944 (K.B. 1785). En este caso, se les impidió a los convictos del caso a cuestionar los procesos deliberativos del jurado. Las cortes estadounidenses fueron adoptando esta regla poco a poco, y *hoy día*, está consagrada en la Regla 606 de las Reglas de Evidencia Federal, 28 USCA.

Ahora bien, por otro lado, *en Puerto Rico*, el derecho a ser juzgado por un Jurado está consagrado en el Artículo II, Sección 11 de nuestra Constitución. También, así está consolidado estatutariamente, en la Regla 111 de las Reglas de Procedimiento Criminal, supra.

Este cuerpo, constituido de doce (12) personas de la comunidad, está encargado de recibir y evaluar la prueba presentada durante un juicio, y finalmente adjudicarla. Nuestro Tribunal Supremo describió de manera asertiva las funciones de este ensamblaje de juzgadores de la siguiente manera:

> La opción de un juicio ante un panel de jurados implica conferir a éstos la administración de la justicia, esto es la determinación final sobre culpabilidad. El Jurado, compuesto por una muestra representativa de la comunidad del acusado tiene como encomienda evaluar la prueba, recibir instrucciones sobre el derecho aplicable, deliberar en secreto y rendir un veredicto final. De entender el Jurado que

el acusado incurrió en responsabilidad criminal por los hechos que se le imputan deberá determinar el delito específico o el grado del mismo, por el cual éste deberá responderle a la sociedad.

*Pueblo v. Echevarría*, 128 DPR 299, 337-338 (1991).

Nuestro Máximo Foro ha sido consistente: las determinaciones de un Jurado merecen y demandan credibilidad, siempre que las mismas no estén vetadas de error manifiesto, pasión, perjuicio o parcialidad. *Pueblo v. Negrón Ramírez,* supra, pág. 913; *Pueblo v. Acevedo Estrada,* supra, págs. 98-99; *Pueblo v. Colón Castillo*, 140 DPR 564, 580 (1996); *Pueblo v. Rosario Reyes*, 138 DPR 591, 598 (1995); *Pueblo v. Rivera Robles*, 121 DPR 858, 869-870 (1988); *Pueblo v. Cabán Torres*, 117 DPR 645, 653-654 (1986). En ausencia de tales circunstancias, la jurisprudencia impide la intervención en apelación. *Id.* Ello es así puesto que "[e]l jurado es el más indicado para otorgar credibilidad y dirimir conflictos de prueba. Son estos quienes normalmente están en mejores condiciones de aquilatar la prueba, pues gozan de la oportunidad de ver y escuchar directamente a los testigos." *Pueblo v. Ruiz Ramos*, 125 DPR 365, 400-401 (1990), citando a *Pueblo v. Pellot Pérez*, 121 DPR 791 (1988)." Véase, además, *Pueblo v. Rosario Reyes,* supra, págs. 598-599.

Ahora bien, esto no es sinónimo a infalibilidad. Ello tampoco implica que se hará caso omiso a los errores que haya cometido el foro de instancia en su evaluación. *Pueblo v. Pagán Díaz,* 111 DPR 608, 621 (1981). Después de todo, los tribunales apelativos, al igual que el tribunal sentenciador, tienen el derecho y el deber de "tener la conciencia tranquila y libre de preocupación". *Pueblo v. Irizarry,* supra, pág. 790; *Pueblo v. Acevedo Estrada,* supra, pág. 100. Un Tribunal revisor puede intervenir en la apreciación de un jurado, que culmine en un fallo condenatorio, cuando una evaluación de la

prueba produzca "serias dudas, razonables y fundadas, sobre la culpabilidad del acusado." *Pueblo v. Carrasquillo Carrasquillo,* supra, pág. 551; *Pueblo v. Rivera Arroyo,* 100 DPR 46 (1971).

A esto añadimos que, tanto nuestro Tribunal Supremo, como el marco normativo sobre el derecho probatorio, han reconocido que un hecho puede ser establecido con solo el testimonio de una persona. *Pueblo v. Toro Martínez,* supra, pág. 860; *Pueblo v. Rodríguez Román,* 128 DPR 121, 128 (1991); *Pueblo v. Acevedo Quiñones,* 100 DPR 894, 899 (1972). Así también, la Regla 110 (D) de las Reglas de Evidencia, supra, establece que "[l]a evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley".

Por tanto, las determinaciones del juzgador de los hechos no deben ser descartadas arbitrariamente ni deben sustituirse por otro criterio a menos que de la prueba admitida surja que no existe base suficiente para apoyarlas. *Pueblo v. Maisonave Rodríguez,* 129 DPR 49, 62 (1991). Es decir, solo debemos apartarnos de esta deferencia cuando la apreciación de la prueba se alejó demasiado de la prueba presentada o cuando la realidad no concuerda con la evidencia sometida durante el juicio, o ésta resultare increíble o imposible. *Pueblo v. Acevedo Estrada,* supra, págs. 98-99.

### D. Prueba Potencialmente Exculpatoria

El Artículo II, Sección 11, de la Constitución de Puerto Rico, Art. II, Sec. 11, Const. PR, LPRA, Tomo 1, le concede a toda persona acusada un derecho a defenderse en el proceso en su contra. Por ello, es importante que el acusado tenga la oportunidad de llevar a cabo un descubrimiento de prueba. *Pueblo v. Custodio Colón,* 192 DPR 567, 584 (2015); *Pueblo v. Guzmán,* 161 DPR 137, 147 (2004); *Pueblo v. Arzuaga,* 160 DPR 520, 530 (2003); *Pueblo v. Santa-Cruz,*

149 DPR 223, 231 (1999); *Pueblo v. Echevarría Rodríguez I*, 128 DPR 299, 324 (1991). De ahí que, la Regla 95 de Procedimiento Criminal, 34 LPRA Ap. II, R. 95, regula el proceso del descubrimiento de prueba entre las partes en los procesos de índole criminal. *Pueblo v. Custodio Colón*, supra, pág. 584. Particularmente, la Regla 95B, 34 LPRA Ap. II, R. 95B, dispone que, antes o durante el juicio, existe un deber continuo de informar a la otra parte cuando advenga en conocimiento de prueba adicional a la que ya fue divulgada.

Asimismo, nuestro ordenamiento jurídico ha adoptado la norma de *Brady v. Maryland*, 373 US 83 (1963), mediante la cual, el Ministerio Público está obligado a descubrir cualquier evidencia que sea relevante a la inocencia o el castigo del acusado, independientemente de la buena o mala fe del Estado. *Pueblo v. Vélez Bonilla*, 189 DPR 705, 718 (2013); *Pueblo v. Hernández García*, 102 DPR 506, 508-510 (1974). Su incumplimiento equivaldrá a una violación del debido proceso de ley. *Pueblo v. Vélez Bonilla*, supra, pág. 718.

Así, pues, se ha definido la *prueba exculpatoria* como "toda aquella que resulta favorable al acusado y que posee relevancia en cuanto a los aspectos de culpabilidad y castigo". *Pueblo v. Vélez Bonilla*, supra, pág. 720. No obstante, la misma no necesariamente es aquella que produciría la absolución del acusado, sino aquella que pudiera favorecer a este, sin tomar en cuenta la confiabilidad o materialidad de la prueba en cuestión. *Id,* pág. 719.

Por otro lado, es *prueba potencialmente exculpatoria* aquella que, al no haber sido preservada por el Estado, no se puede determinar a ciencia cierta si hubiese tenido algún valor exculpatorio. *Id,* pág. 725. En este caso, el Tribunal deberá tomar en consideración los siguientes factores:

> (1) determinar que la evidencia no está disponible por una acción u omisión del Estado; (2) determinar que la evidencia

constituía evidencia pertinente conforme se define en la Regla 401 de Evidencia de Puerto Rico, y (3) determinar que, según la teoría de la defensa, de estar disponible esta evidencia obraría a favor del acusado.

*Pueblo v. Vélez Bonilla*, supra, pág. 725.

De este modo, cae sobre el acusado la responsabilidad de poner en posición al Tribunal cómo la prueba en cuestión le será favorable. No empece lo anterior, conforme al estándar de prueba de probabilidad razonable que permea en los procesos de esta índole, no es responsabilidad del acusado demostrar que la *evidencia potencialmente exculpatoria* hubiese probado su inocencia. *Id*, págs. 725-726. Será suficiente que demuestre que dicha prueba disminuiría la confianza en el resultado. *Id.*

De cumplir con estos requisitos, corresponderá al Ministerio Público presentar las circunstancias que provocaron la pérdida o destrucción de la *evidencia potencialmente exculpatoria*. Por consiguiente, el Tribunal deberá determinar si la actuación del Estado constituyó mala fe o negligencia. *Pueblo v. Vélez Bonilla*, supra, pág. 726. De entender que se debió a la mala fe, procederá la desestimación. *Id.*, pág. 726. De este modo, se considerará *mala fe* "la actuación intencional o el esfuerzo consciente de un agente o funcionario del Estado de desaparecer la evidencia buscando afectar así el resultado del proceso criminal". *Id*, pág. 722.

Por otro lado, si la pérdida de la prueba es producto de la negligencia del Estado, tendrá el acusado una presunción a su favor, conforme a la Regla 301(c) de Evidencia, 32 LPRA Ap. VI., R. 301. *Pueblo v. Vélez Bonilla,* supra, pág. 726. Se entenderá por *negligencia* "aquella circunstancia en la que el Estado haya fallado en ejercer el cuidado que una persona común ejercería". *Id,* pág. 725. Por último, de no haber sido por ninguna de las anteriores, se

considerará que no ha habido una violación al debido proceso de ley. *Id,* pág. 726.

### E. Orden de Registro y Allanamiento

A nivel federal, la Constitución de Estados Unidos, en su Cuarta Enmienda, dispone lo siguiente:

> No se violará el derecho del pueblo a la seguridad de sus personas, hogares, documentos y pertenencias, contra allanamientos e incautaciones fuera de lo razonable, y no se expedirá ningún mandamiento judicial para el efecto, si no en virtud de causa probable, respaldada en juramento o promesa, y con la descripción en detalle del lugar que habrá de ser allanado y de las personas o efectos que serán objeto de detención o incautación.

> Emda. IV, Const. EE. UU., LPRA, Tomo 1.

La protección que brinda la aludida Cuarta Enmienda fue extendida a Puerto Rico por medio del caso *Torres v. Com. of Puerto Rico*, 442 US 465, 471 (1979). Así, a través de la Carta de Derechos de nuestra Constitución, se estableció un derecho a la protección de toda persona contra registros y allanamientos irrazonables por parte del Estado. Específicamente, la Constitución de Puerto Rico dispone lo siguiente:

> No se violará el derecho del pueblo a la protección de sus personas, casas, papeles y efectos contra registros, incautaciones y allanamientos irrazonables.
> No se interceptará la comunicación telefónica.
> Sólo se expedirán mandamientos autorizando registros, allanamientos o arrestos por autoridad judicial, y ello únicamente cuando exista causa probable apoyada en juramento o afirmación, describiendo particularmente el lugar o registrarse, y las personas a detenerse o las cosas a ocuparse.
> Evidencia obtenida en violación de esta sección será inadmisible en los tribunales.

> Art. II, Sec. 10, Const. PR, LPRA, Tomo 1.

De este modo, nuestra Carta Magna refleja una protección más amplia que la Constitución de Estados Unidos. Esto es así,

debido a que "[e]l reconocimiento expreso del derecho a la intimidad en nuestra Constitución, y la preeminencia de éste al momento de evaluar las acciones gubernamentales, permiten que el alcance de la protección contra registros y allanamientos sea mayor". *Pueblo v. Rolón Rodríguez*, 193 DPR 166, 175 (2015); Véase, además, E.L. Chiesa, *Derecho procesal penal: etapa investigativa*, San Juan, Pubs. JTS, 2006, págs. 98–99. Por ende, *para que el Estado pueda llevar a cabo un registro y/o allanamiento de la persona o sus efectos, será necesaria una orden judicial que esté basada en la existencia de causa probable.* El magistrado deberá determinar la causa probable a base de criterios de razonabilidad y probabilidad, fundamentados en hechos y no en meras sospechas. *Pueblo v. Colón Bernier*, 148 DPR 135, 144 (1999). Así también, nuestra Constitución establece expresamente una regla de exclusión de evidencia, mediante la cual toda evidencia que se obtenga en violación a lo dispuesto será inadmisible en el Tribunal. *Pueblo v. Rolón Rodríguez*, supra, pág. 175; *Pueblo v. Colón Bernier*, supra, pág. 148.

Por su parte, la Regla 231 de Procedimiento Criminal, 34 LPRA Ap. II, R. 231, nos ilustra los requisitos que deben cumplirse para que un magistrado pueda librar una orden para llevar a cabo un registro y allanamiento. La aludida Regla expone lo siguiente:

> No se librará orden de allanamiento o registro sino en virtud de declaración escrita, prestada ante un magistrado bajo juramento o afirmación, que exponga los hechos que sirvan de fundamento para librarla. ***Si de la declaración jurada y del examen del declarante el magistrado quedare convencido de que existe causa probable para el allanamiento o registro, librará la orden en la cual se nombrarán o describirán con particularidad la persona o el lugar a ser registrado y las cosas o propiedad a ocuparse. La orden expresará los fundamentos habidos para expedirla, y los nombres de las personas en cuyas declaraciones juradas se basare.*** Ordenará al funcionario a quien fuere dirigida registre inmediatamente a la persona o sitio que en ella se indique, en busca de la propiedad

especificada, y devuelva al magistrado la orden diligenciada, junto con la propiedad ocupada. La orden dispondrá que será cumplimentada durante las horas del día, a menos que el magistrado, por razones de necesidad y urgencia, dispusiere que se cumplimente a cualquier hora del día o de la noche.

(Énfasis suplido).

Así, una orden diligenciada en contravención a estos requisitos será nula. *Pueblo v. Rolón Rodríguez*, supra, pág. 181. Por lo tanto, una orden que carezca de los fundamentos específicos que dieron base para su expedición, entiéndase la causa probable que la motivó, o un resumen de estos, será insuficiente de su faz. *Id.* No obstante, a pesar de que el magistrado tiene el deber de determinar que existe causa probable para poder autorizar una orden, nuestro Tribunal Supremo ha aclarado que no es un requisito indispensable que el mismo interrogue a quien realiza la declaración jurada que da base para ello. *Pueblo v. Santiago Feliciano*, 139 DPR 361, 404 (1995). En consecuencia, si al solicitar una orden hay una declaración jurada que exponga los hechos que justifican la causa probable de manera clara, detallada, libre de contradicciones, y el juez no tiene dudas sobre lo esbozado, basta con que el declarante esté *disponible* para ser interrogado. *Id.*

Asimismo, el testimonio del agente del orden público que brinde en la declaración jurada deberá ser específico en cuanto al lugar que habrá de registrarse y la persona o personas que habrán de ser detenidas. *Pueblo v. Nieves Hernández*, 174 DPR 877, 879 (2008); *Pueblo v. Rivera Rodríguez*, 123 DPR 467, 480 (1989); *Pueblo v. González del Valle*, 102 DPR 374, 376 (1974). En este caso, la parte que se propone impugnar la razonabilidad de dicho registro tendrá el peso de la prueba para demostrar que dicho testimonio consiste en uno vago o estereotipado. *Pueblo v. Nieves Hernández,* supra, págs. 881-882.

Para ello, nuestro ordenamiento jurídico provee un medio procesal para impugnar el registro o allanamiento que se haya llevado a cabo por el Estado, independientemente de que haya una orden judicial de por medio. El mismo esta codificado bajo la Regla 234 de Procedimiento Criminal, 34 LPRA Ap. II, R. 234, la cual hace cumplir la regla de exclusión de evidencia ilegalmente obtenida que obra expresamente en nuestra Constitución, Art. II, Sec. 10, Const. PR, LPRA, Tomo 1. De esta forma, a través de la Regla 234 de Procedimiento Criminal, supra, una persona afectada por un registro o allanamiento ilegal podrá solicitar la supresión de la evidencia que se obtuvo como consecuencia de ello, bajo cualquiera de los siguientes fundamentos:

(a) Que la propiedad fue ilegalmente ocupada sin orden de allanamiento o registro.

(b) Que la orden de allanamiento o registro es insuficiente de su propia faz.

(c) Que la propiedad ocupada o la persona o sitio registrado no corresponde a la descripción hecha en la orden de allanamiento o registro.

(d) Que no había causa probable para creer en la existencia de los fundamentos en que se basó la orden de allanamiento o registro.

(e) Que la orden de allanamiento fue librada o cumplimentada ilegalmente.

(f) Que es insuficiente cualquier declaración jurada que sirvió de base a la expedición de la orden de allanamiento porque lo afirmado bajo juramento en la declaración es falso, total o parcialmente.

[…]

En esta moción de supresión de evidencia se deberán exponer los hechos precisos o las razones específicas que sostengan el fundamento o fundamentos en que se basa la misma. El Tribunal oirá prueba sobre cualquier cuestión de hecho necesaria para la resolución de la solicitud y celebrará vista evidenciaría ante un magistrado distinto, cuando se trate de evidencia incautada

mediante una orden judicial. 34 LPRA Ap. II, R. 234; *Pueblo vs. Rolón Rodríguez,* supra, pág. 183; *Pueblo vs. Maldonado Rosa,* 135 DPR 563, 569 (1994). En casos en que se determine que la evidencia incautada fue en violación al mandato constitucional y a lo dispuesto por esta regla, el Tribunal deberá suprimir la evidencia obtenida. En consecuencia, ésta no será admisible en los tribunales como prueba sustantiva de la comisión de un delito.

Ahora bien, cuando el registro o allanamiento se lleve a cabo sin una orden válida, el mismo se presumirá irrazonable. *E.L.A. v. Coca Cola Bott. Co.,* 115 DPR 197, 207 (1984). Por lo cual, tendrá el Ministerio Público el peso de la prueba para rebatir dicha presunción y demostrar la legalidad y razonabilidad de la actuación del Estado. *Pueblo v. Blase Vázquez,* 148 DPR 618, 631 (1999); *Pueblo v. Vázquez Méndez,* 117 DPR 170, 177 (1986). Para ello, deberá probar que existieron circunstancias excepcionales que justificaron la intervención del Estado en ausencia de una orden judicial previa. *Pueblo v. Blase Vázquez,* supra, pág. 631. Las mismas deberán ser evaluadas a la luz de las circunstancias particulares de cada caso. *Pueblo v. López Colón,* 200 DPR 273, 288 (2018). Algunas de estas excepciones pudieran ser:

> (1)un registro incidental a un arresto legal; (2) un registro consentido voluntariamente de forma expresa o implícita; (3) un registro en situación de emergencia; (4) una evidencia ocupada en el transcurso de una persecución; (5) una evidencia a plena vista; (6) cuando el agente del orden público obtiene conocimiento de la existencia del material delictivo a través del olfato; (7) una evidencia arrojada o abandonada; (8) un registro o allanamiento de una estructura abandonada; (9) una evidencia obtenida durante un registro administrativo...; (10) un registro tipo inventario, o (11) una evidencia obtenida en un lugar público como resultado de la utilización de canes para olfatear.
>
> (Énfasis omitido).

No obstante, independientemente de que hubiese existido alguna de las circunstancias excepcionales, la presunción de irrazonabilidad del registro es automática ante la falta de una orden judicial previa. *Pueblo v. Blase Vázquez*, supra, pág. 632.

"Por otro lado, **cuando el registro se efectúa al amparo de una orden judicial impera una presunción de legitimidad, pues toda determinación judicial se acompaña de una presunción de corrección.** En esos casos, *el acusado tiene el peso de la prueba para rebatir la legalidad y razonabilidad de la actuación gubernamental*". *Pueblo v. Nieves Hernández*, supra, pág. 881. (Énfasis nuestro). Por ello, al evaluar una moción de supresión de evidencia presentada bajo el fundamento de falta de causa probable, el magistrado debe darle cierta deferencia a la determinación que hizo el juez original que expidió la orden. *Pueblo v. Nieves Hernández,* supra, pág. 881; E.L. Chiesa Aponte, *Derecho Procesal Penal de Puerto Rico y Estados Unidos*, Bogotá, Ed. Forum, 1992, Vol. I, pág. 370.

Igualmente, cuando hay una orden judicial para el registro, y de los escritos de las partes no surge una controversia sustancial de hechos que hagan necesaria la celebración de una vista, el tribunal tiene la facultad para resolver la moción de supresión de evidencia a base de los escritos presentados. *Pueblo v. Maldonado, Rosa*, supra, pág. 569. Lo anterior, no solo fomenta el principio de la economía procesal que permea en nuestro ordenamiento jurídico, sino que también es congruente con la presunción de legalidad que cobija al registro realizado por vía de una orden judicial previa. *Pueblo v. Maldonado, Rosa*, supra, pág. 570.

Por otra parte, y atinente a lo que nos ocupa, para reclamar la supresión de una evidencia, el proponente debe tener legitimación activa para ello. Respecto a ello, el profesor Chiesa ha explicado lo siguiente:

Quien invoca la regla de exclusión ha de tener legitimación activa – "standing" – para ello. Esto lo que significa es que sólo la persona quien ha sufrido la violación constitucional en relación a la protección contra detenciones, registros o incautaciones irrazonables, puede invocar la regla de exclusión, pues ésta no es sino el remedio que tiene quien sufre la violación de su derecho constitucional. Así, pues*, **no todo acusado que pudiera beneficiarse con la exclusión de la evidencia ilegalmente obtenida tiene "standing" o legitimación activa para solicitar la supresión de la evidencia.** El propio texto de la Regla 234 de Procedimiento Criminal de Puerto Rico sugiere este requisito, pues se alude a que "la persona agraviada por un allanamiento o registro ilegal podrá solicitar del tribunal" la supresión de la evidencia producto de un registro ilegal. No se trata de que cualquier acusado que se vería beneficiado con la excusación de la evidencia puede solicitar la supresión.

Ernesto L. Chiesa Aponte, *Procedimiento Criminal: Etapa Investigativa,* Situm, 2017, sec. 5.3 (B), págs. 255-256. (Énfasis nuestro.).

Por ello, cuando se trata del registro de *un celular*, hay que determinar si la parte afectada tiene una expectativa de intimidad respecto al mismo para establecer que tiene legitimación activa para impugnar la intervención del Estado.  Particularmente, crea mayor importancia debido a que los celulares han sido reconocidos como minicomputadores que pudieran albergar información sensitiva. *Riley v. California,* 573 US 373, 393 & 396 (2014).

A modo de excepción, como mencionamos anteriormente, el Estado pudiera llevar a cabo un registro sin orden judicial cuando media el consentimiento de la parte que posee expectativa de intimidad sobre sus efectos. *Pueblo v. López Colón,* supra, pág. 288; *Pueblo v. Miranda Alvarado,* 143 DPR 356, 364 (1997); *Pueblo en interés menor N.O.R.,* 136 DPR 949, 964 (1994). Para que el mismo sea válido, es necesario que quien preste el consentimiento tenga autoridad para ello y que sea brindado de manera voluntaria. *Pueblo v. López Colón, supra,* pág. 289. No obstante, para aparentar tener

autoridad para brindar el consentimiento, no es necesario que sea la persona con un interés legal sobre la propiedad en cuestión, sino que basta con que posea autoridad común y otra relación suficiente respecto al objeto a ser registrado. *Id.*, pág. 290. "Así, la 'autoridad común' no se basa en el derecho de propiedad, sino en el *uso mutuo de los bienes por personas que generalmente tienen acceso o control conjunto sobre la propiedad*". *Id.*, pág. 291.

**III.**

Rivera Marrero recurre ante nos impugnando la sentencia recaída en su contra, señalando la comisión de *tres (3) errores*. El apelante alega que no se probó más allá de duda razonable su culpabilidad. Igualmente, señala que el TPI-Ponce debió desestimar el caso en su contra por haberse destruido prueba potencialmente exculpatoria. Por último, aduce que el Foro Primario erró al permitir que se admitiera evidencia obtenida mediante un registro irrazonable.

En el *primer señalamiento de error*, con relación al peso de la prueba, adelantamos que *no le asiste la razón* al apelante. Es norma reiterada que el quantum de prueba en los casos criminales es que se tiene que probar la culpabilidad del acusado más allá de duda razonable. El mismo estándar de prueba aplica en los juicios que son vertidos ante *un Jurado*. Nuestro ordenamiento jurídico ha sido consistente en reiterar que los veredictos que emite un Jurado gozan de una presunción de corrección. Salvo que los mismos estén vetados de error manifiesto, pasión, perjuicio o parcialidad, el veredicto de un Jurado merece credibilidad y deferencia. En ausencia de lo anterior, los tribunales revisores estamos vedados de intervenir con sus determinaciones. Es el Jurado quien está en mejor condición de aquilatar la prueba y otorgar un valor probatorio a los testimonios vertidos en el juicio, pues son quienes tienen la

oportunidad de observar el *demeanor* de los testigos. Un tribunal revisor solo podrá intervenir en la apreciación de la prueba cuando, al evaluar lo presentado, surjan serias dudas sobre la culpabilidad del acusado.

Además, el apelante alega que se le encontró culpable por haberle dado credibilidad al testimonio de Thalia Rivera Santiago, quien, según alega, fue la única que lo relacionó con los hechos de este caso y que la misma fue coaccionada por el Estado para cambiar su versión de lo ocurrido. No obstante, surge de los autos que obran ante nos y de la transcripción de la prueba oral que la testigo declaró en el juicio aproximadamente cinco (5) años después de los hechos. Aun así, su testimonio fue consistente con la versión de los hechos que le contó al agente López Sánchez en el año 2016. Más aun, nuestro ordenamiento jurídico ha reiterado que para establecer un hecho, es prueba suficiente lo declarado por un solo testigo. *Pueblo v. Toro Martínez,* supra, pág. 860.

El apelante también alegó que la triangulación que se realizó de su teléfono no fue lo suficientemente certera para demostrar que estuvo presente en el lugar de los hechos. Igualmente, planteó que la investigación hecha por los agentes del orden público fue deficiente. No obstante, el Jurado escuchó a los correspondientes testigos y le otorgó credibilidad a lo declarado. Al evaluar el recurso, los autos originales y la transcripción de la prueba oral, no surge que el Jurado haya incurrido en error manifiesto, pasión, perjuicio o parcialidad. Tampoco justipreciamos que existan serias dudas, como lo exige nuestro ordenamiento jurídico, para intervenir en la apreciación de la prueba que realizó este Jurado. De este modo, debemos ceder ante la deferencia merecida por el veredicto emitido en este caso.

Por otro lado, en cuanto al *segundo señalamiento de error*, el apelante alegó que el Foro Primario debió haber desestimado el caso

porque el Estado destruyó prueba potencialmente exculpatoria. *No le asiste la razón.* Surge del recurso que dicha prueba se trata de las declaraciones escritas a puño y letra por la testigo Thalia Rivera Santiago, las cuales fueron alegadamente destruidas por el agente López Sánchez.

Según la norma esbozada anteriormente, este tipo de prueba es aquella que no se puede determinar a ciencia cierta si tiene algún valor exculpatorio. Para ello, entre otros factores, el Foro Primario debe "determinar que, según la teoría de la defensa, de estar disponible esta evidencia obraría a favor del acusado". *Pueblo v. Vélez Bonilla*, supra, pág. 725. Es decir, es responsabilidad del acusado poner en posición al Tribunal para evaluar si dicha prueba le era favorable, o demostrar que la misma disminuiría la confianza en el resultado.

En el caso ante nos, la supuesta prueba potencialmente exculpatoria surge del testimonio de Thalia Rivera Santiago, quien, en el contrainterrogatorio realizado por la defensa, declaró que el agente López Sánchez rompió en varias ocasiones las declaraciones que escribió a puño y letra. No obstante, surge de la transcripción oral que el agente López Sánchez no le indicó a la testigo qué escribir. Igualmente, la testigo no declaró que durante la entrevista con el mencionado agente, se haya sentido coaccionada u obligada a responder las preguntas de la manera en que lo hizo. Más aun, como mencionamos previamente, la testigo se sentó a declarar casi cinco (5) años después de los hechos, y su testimonio fue consistente en cuanto a lo ocurrido desde el año 2016.

Asimismo, era responsabilidad del acusado demostrar que dicha prueba le hubiese favorecido como prueba potencialmente exculpatoria. No obstante, ni del recurso que obra ante nos, ni de la prueba vetada en el juicio, surge que lo declarado por la testigo en las aludidas declaraciones hubiese sido favorable para el apelante.

La prueba que desfiló durante el proceso corroboró las declaraciones de la testigo. Por lo cual, es nuestra apreciación que no se cumplieron con los requisitos para establecer que la prueba era potencialmente exculpatoria. De este modo, entendemos que el TPI-Ponce no erró al impedir la desestimación del juicio.

Por último, en su *tercer señalamiento de error*, el apelante planteó que no se debió permitir la admisión de la evidencia que se obtuvo como consecuencia de una Orden de Registro y Allanamiento por ser esta presuntamente irrazonable. Alegó que la causa probable que justificó la emisión de la aludida Orden no era suficiente para ello. Adujo el apelante que el hecho de que la triangulación de los teléfonos haya reflejado que Rivera Marrero estuvo cerca del área de los hechos y que hubo comunicación entre su número de teléfono y el de uno de los occisos, no es suficiente para sustentar la determinación de causa probable.

La doctrina pertinente al asunto ha establecido que la determinación de causa probable debe hacerse a base de criterios de razonabilidad y probabilidad, que estén fundamentados en hechos y no meras sospechas. La misma debe ser hecha por un magistrado, la cual pudiera llevar a cabo al evaluar una declaración jurada que exponga los requisitos para poder conceder la orden. Del mismo modo, la declaración debe cumplir con criterios de especificidad en cuanto al lugar, cosa y/o personas a registrarse. Asimismo, *cuando el registro se lleve a cabo por vía de una orden judicial, el mismo gozará de una presunción de legitimidad*. En este caso, *será el acusado quien tendrá el peso de la prueba para rebatir dicha presunción*.

Del caso que obra en autos, surge que se emitió una Orden de Registro y Allanamiento para el celular del apelante. Igualmente, el apelante impugnó la misma durante el proceso en su contra y acudió ante este Foro Apelativo, ante un Panel Hermano, quien

determinó que la orden se concedió conforme a derecho y permitió la admisión de la evidencia que surgió de la misma. Luego de evaluar la prueba ante nos, es nuestra apreciación que la Orden de Registro y Allanamiento cumplió con los rigores que exige nuestra Constitución. La misma fue específica en cuando al objeto que se pretendía registrar e incautar, y en cuanto a la causa probable que motivó dicha solicitud. Por ende, entendemos que, conforme a lo decidido previamente por este Tribunal de Apelaciones, *tampoco le asiste la razón al apelante en cuanto a este error.*

Así, evaluado el recurso y la prueba que obra en autos, y la norma anteriormente esbozada, justipreciamos que los errores señalados por Rivera Marrero no se cometieron. Por todo lo cual sostenemos el dictamen impugnado.

**IV.**

Por los fundamentos que anteceden, *confirmamos la "Sentencia" apelada.*

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

LCDA. LILIA M. OQUENDO SOLÍS
Secretaria del Tribunal de Apelaciones